**STATE of Iowa, Appellee,**

v.

**Jerry Lee Michael NEWELL, Appellant.**

No. 03–0624.

Supreme Court of Iowa.

Feb. 10, 2006.

Rehearing Denied March 1, 2006.

Linda Del Gallo, State Appellate Defender, and Tricia A. Johnston, Assistant State Appellate Defender, for appellant, and Jerry Newell, pro se.

Thomas J. Miller, Attorney General, Thomas S. Tauber, Assistant Attorney General, Thomas J. Ferguson, County Attorney, and James Katcher and Linda

Myers, Assistant County Attorneys, for appellee.

TERNUS, Justice.

The appellant, Jerry Newell, was convicted of first-degree murder in the death of his live-in girlfriend, Kathy Gillen. *See* Iowa Code § 707.2 (2001) (defining murder in the first degree). His counsel on appeal specifies several errors in the district court's rulings and asserts a claim of ineffective assistance of counsel. The defendant has filed a pro se brief raising additional claims. Finding no basis for reversal, we affirm.

I. *Background Facts and Proceedings.*

The following unchallenged evidence was admitted at the defendant's trial. At the time of the victim's death, the defendant and the victim were living together with their two-month-old baby in Waterloo, Iowa. On June 15, 2001, the couple left the baby with the defendant's mother, Mary Culbert, went to some garage sales, and then drank at a local bar. While at the bar, they each had about five drinks. Witnesses who saw them there said the couple appeared to be getting along well. Around 6:30 p.m., Newell and Gillen returned to Culbert's house and picked up their child.

After arriving home, Gillen left on foot at approximately 7:45 p.m. to get something for them to eat from a nearby grocery store. When she did not return right away, Newell called Gillen's father to ask if she was there. Eventually, Newell fixed himself something to eat, fed the baby, and dozed off on the couch.

Newell later told the police that he woke up sometime after 10:00 p.m. when he heard Gillen toss a bag of groceries on the living room floor. Shortly after that, he claimed he heard a noise in the kitchen. When he went to investigate he found Gillen lying on the floor, unresponsive.

Newell claimed he tried to revive her by pushing her, throwing water on her, lifting her head, and attempting CPR. When Gillen did not respond, Newell said he "freaked." Instead of calling 911, he called his mother's house, looking for his mom. After speaking with his brother, Newell gathered up the baby and drove to his mother's house.

Evidence admitted at trial showed that Newell omitted some facts in his statements to the police and that not all of his assertions about the events up to this point in time were true. A cash register receipt from a nearby grocery store established that Gillen had purchased groceries at 9:29 p.m. that evening. Neighbors testified they saw Gillen outside as it was getting dark, trying to catch Newell's dog. One of these neighbors testified that he saw Newell standing at the back door while Gillen chased the dog and returned to the house. About an hour later this neighbor heard the defendant talking to his brother, and then heard the defendant's car leave. Another neighbor testified that at about this same time he heard "a lot of yelling and screaming, doors slamming." Afterwards, he heard a truck pull out and speed south down the street. A third witness testified he actually saw the defendant get into his car and speed off.

The defendant's brother, Jonathan Newell, testified that around 9:40 p.m. he answered the phone at the home of Mary Culbert, the Newell brothers' mother. The caller was the defendant; he wanted to talk to Culbert, but Culbert was not home. In a second call to the house, Newell told his brother that something was wrong with Gillen and said, "She might be dead." Jonathan contacted Culbert at a friend's house, gave her Newell's message, and then got on his bike and headed toward Newell's house. On the way, he met Newell, and they both returned to Cul-

bert's house, where they met Culbert. There, Newell told his mother that Gillen was on the floor, and he could not tell whether she was breathing. Culbert then left for Newell's house.

After Culbert left, Newell went into his mother's house with the baby. Shortly thereafter, he called his own house and talked to Culbert, asking about Gillen's condition. He also spoke with Jonathan about what happened at Newell's house. According to Jonathan, Newell told him that Gillen was leaving out the back door when Newell told her, "You ain't leaving again," and pushed her back. Newell told his brother that Gillen made a funny noise and dropped to the floor. Jonathan testified Newell told Jonathan that he attempted CPR, poured water on Gillen, and also poured something into her mouth. Newell was scared and told his brother that he "thought he was going to get it for murder." After talking with his brother, Newell left his mother's house without his child, but did not tell Jonathan where he was going.

In the meantime, Culbert had entered her son's house and had discovered Gillen on the floor, warm to the touch but with no pulse. After speaking with her son on the phone, Culbert called 911 from Newell's home at 10:18 p.m. Paramedics were dispatched on a "fall, unconscious person" call. They arrived at the house within two to three minutes and found the victim on the kitchen floor, without pulse or respirations. The paramedics attempted to resuscitate Gillen by initiating CPR and intubating her. Intubation was difficult because Gillen's throat kept filling up with a clear liquid fluid, which contained no evidence of stomach contents. During an attempt at intubation, the fluid came up through the ET tube and into one paramedic's mouth. He testified the fluid tasted like straight tequila, and he thought

that it had been poured into the victim's mouth. Despite their efforts, emergency personnel were unable to revive Gillen. It was estimated that she had been dead from fifteen minutes to an hour when the paramedics arrived.

Meanwhile Newell had left Culbert's house, riding a bicycle over to a friend's home, Deanne Waniorek, arriving between 10:00 p.m. and 11:00 p.m. Newell told Waniorek that he had been upset with Gillen because she had been gone so long. When Gillen told Newell she was leaving, he responded, "No, you're not," and stopped her by pushing her. Gillen, he stated, fell over. Newell told Waniorek that initially he thought that Gillen was faking, and he tried shaking her. When she did not respond, he attempted CPR, and he was afraid he might have hurt her by doing it incorrectly. Newell also confided in his friend that he was concerned he "might have done something wrong and he could be in trouble, he might go to prison." While at Waniorek's home, Newell also talked to another person there, Keith Wirtz. Newell told Wirtz a different story than he had told Waniorek. According to Wirtz, Newell told Wirtz that Newell had had an argument with his girlfriend and that Newell thought she had died of alcohol poisoning.

Newell stayed at Waniorek's house a short time and then returned to his mother's home. There, he was told that Gillen was dead. When asked what had happened, Newell said that Gillen had been fine when he left. Newell paced nervously in the house and repeatedly stated, "What am I going to do?" After a short time, Newell left his mother's house. He did not go home or contact the police. The following day he called his father, and at about 2:45 p.m., his father took him to the police station.

Newell was interviewed at the police station on June 16, 2001. As previously noted, he told the police he heard a noise in the kitchen and found Gillen passed out on the floor. He claimed he did not know why he had not called 911, just that the baby was screaming. He also failed to tell the police about his visit to Waniorek's house and his conversations with her and Wirtz.

A couple of days after Gillen's death, Newell discussed what had occurred with his friend, Jim McClain. According to McClain, Newell told him that when Gillen came home, she threw some beer on the floor, and a few seconds later, she fell over something. When Newell heard her fall, "he [came] running out, and one thing led to another, and he started giving her CPR, and she started vomiting." McClain testified that Newell said he did not know if he left any marks on Gillen but that he began to panic and started "hitting her back and forth trying to bring her to." Newell also surmised that in his attempt to perform CPR "he might have came up and hit [Gillen] in the neck ... and made marks on her neck."

An autopsy of the victim's body revealed injuries to the internal structures of Gillen's neck and pinpoint hemorrhages on her neck, face, and eyelids, indications that she had been strangled. Gillen also had two large bruises on her head that had caused subarachnoid hemorrhaging. Over two dozen bruises were found on her hands, arms, torso, legs and inside her mouth that had been inflicted about the time of her death. The injuries to her hands were interpreted to be defensive in nature. A toxicology evaluation revealed her body contained a low level of alcohol and no other drugs. The medical examiner ruled the cause of death was strangulation and blunt force trauma to the back of the victim's head. The injuries were con-sistent with someone strangling the victim and banging her head against the wall or floor. The injuries were inconsistent with a simple accidental fall to the floor.

Newell was subsequently arrested for Gillen's death. While awaiting trial, Newell confided in a fellow jail inmate, Eric Pasket, telling him what happened the night Gillen died. According to Pasket, Newell told him that after Gillen returned home from the store, the couple argued about where she had been and how long she had been gone. When Gillen started to leave the room, Newell ran up behind her and grabbed her, and then their heads hit. Newell stated he "head butted her twice and then she fell to the ground."

Newell's friend, Jim McClain, testified at trial that after Newell learned that Gillen had died from a devastating blow to the head, he approached McClain, who was also incarcerated at the time, with a fabricated story to explain Gillen's head and hand injuries. Newell wanted McClain to testify that McClain was at the defendant's residence when Gillen returned from the store, and that Gillen got angry and stormed into the kitchen with Newell right behind her. McClain was further to testify that he followed the couple into the kitchen where he found them "passionately dancing" with Gillen's fingers in Newell's belt loops. Then, under this scenario, the "accident" occurred when Gillen backed up and fell, pulling Newell on top of her. According to McClain, Newell thought the fall would account for Gillen's head injuries, and Gillen's fingers being caught in the belt loops of Newell's pants would explain the bruises to her fingers. Newell reportedly told McClain that "this had to become an accident on [Gillen's] part or he [Newell] was going to be charged with first-degree murder." Newell threatened to give prosecutors information about

McClain if McClain refused to lie for Newell at trial.

Newell was charged with murder in the first degree under alternative theories of premeditation and felony murder. *See* Iowa Code § 707.2(1), (2). A jury convicted Newell of this charge on March 3, 2003. The defendant's motion for new trial and motion in arrest of judgment were overruled by the trial court, and he was sentenced to life imprisonment. This appeal followed.

## II. *Evidence of Hearsay and Prior Acts.*

A. *Challenged testimony.* Newell challenges the trial court's admission of testimony concerning the relationship between the defendant and Gillen, claiming the evidence constituted inadmissible hearsay and inadmissible prior-bad-acts evidence. The defendant objected to the following testimony:

1. Gillen's estranged husband, Robert Gillen, Jr., testified he heard Newell call Gillen a "dumb f* * *ing bitch." He also described a phone conversation he had with Gillen just days before her death. Gillen seemed distressed, spoke in whispers, and stated Newell was standing there listening. Robert Gillen spoke with Gillen again on the day she died. Gillen was upset and said she did not want their children to visit that weekend because she had found out something about Newell and was scared. Gillen told her husband she was planning to leave Newell, but she was concerned about the baby. She complained that she was not allowed to go anywhere with the baby alone.

2. Gillen's brother, Kevin Hamilton, testified he saw injuries on his sister, including a knot on her head, about ten days before Gillen's death. His sister told him the defendant had head-butted her. Hamilton testified Gillen complained that she and Newell were not getting along, and she expressed fears for her safety. Hamilton thought Gillen was afraid of Newell.

3. Gillen's sister-in-law testified that Gillen told her Newell would not let Gillen be alone with the baby. Gillen also said that bruises on Gillen's head came from being head-butted, and from the context of this statement, the witness inferred the defendant was the perpetrator. The witness further testified she observed bruises on the victim's arm that looked like fingerprints. Gillen told the witness that she feared the defendant was going to do something to her. Gillen also expressed concern that she would not get her baby back if she left Newell.

4. Another brother of Gillen, Brian Reich, testified Gillen planned to leave Newell about a month before her death, but changed her mind a week later. Reich then visited his sister to talk her into leaving, but she was scared and crying and told him she was afraid Newell would harm her brother and his fiancée if she left.

5. Gillen's cousin testified to her observation that when Gillen and Newell visited, they usually brought the baby, but when Gillen visited alone, she never had the baby with her. Gillen always said the baby was with her mother-in-law. She stated Gillen talked about leaving Newell and acted scared just talking about doing so. Gillen told the witness one week before her death that she feared for her safety because she had found out something about the defendant.

6. Gillen's aunt testified that a week before her death, Gillen expressed fear of the defendant and said he was keeping Gillen on a timetable. Additionally, the aunt testified Gillen said she had found out something about the defendant and Gillen was afraid.

7. Various neighbors testified about verbal arguments they heard, but they denied seeing any physical abuse.

8. Jim McClain testified the defendant began treating Gillen badly a few weeks prior to her death and had begun calling her names, although McClain never saw any physical altercations. The night before Gillen died McClain offered to take her away from Newell, but Gillen refused the offer, expressing fear of the defendant.

B. *Scope of review.* We review the defendant's hearsay claims for errors at law. *State v. Buenaventura,* 660 N.W.2d 38, 50 (Iowa 2003). "Hearsay ... must be excluded as evidence at trial unless admitted as an exception or exclusion under the hearsay rule or some other provision." *State v. Dullard,* 668 N.W.2d 585, 589 (Iowa 2003). Subject to the requirement of relevance, the district court has no discretion to deny the admission of hearsay if it falls within an exception, or to admit it in the absence of a provision providing for admission. *Id.* Inadmissible hearsay is considered to be prejudicial to the nonoffering party unless otherwise established. *State v. Long,* 628 N.W.2d 440, 447 (Iowa 2001).

Rulings on the admissibility of prior-acts evidence are reviewed for an abuse of discretion. *State v. White,* 668 N.W.2d 850, 853 (Iowa 2003). "[W]e find an abuse of that discretion only when a party claiming it shows the discretion was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *State v. Powell,* 684 N.W.2d 235, 238 (Iowa 2004).

C. *Hearsay evidence.* Hearsay "is a statement, other than one made by the declarant while testifying at ... trial, ... offered in evidence to prove the truth of the matter asserted." Iowa R. Evid. 5.801(c); *see also Dullard,* 668 N.W.2d at 589–90 (stating a statement is not hearsay if it is not offered to prove the truth of the matter asserted). Hearsay is not admissible unless it falls within one of several enumerated exceptions. Iowa R. Evid. 5.802; *Buenaventura,* 660 N.W.2d at 51.

1. *Evidence not hearsay.* Much of the evidence to which the defendant objects is not hearsay. Evidence that Newell was heard to call the victim derogatory names is not hearsay because it was not offered to prove the truth of the matter asserted, i.e., that Gillen was what the defendant called her. *See also* Iowa R. Evid. 5.801(d)(2) (stating statement "offered against a party" and which is "the party's own statement" is not hearsay). Evidence that the neighbors heard raised voices and arguing is also not hearsay. These witnesses did not testify to the content of the arguments, only that they occurred. Similarly, testimony about injuries the witnesses *observed* on Gillen prior to her death was not hearsay because these observations are not statements made by a declarant other than the witness. The same conclusion is warranted with respect to the witnesses' testimony that Gillen appeared scared, nervous, or distressed. This evidence did not contain any out-of-court statements admitted for the truth of the matter asserted, only evidence of the witnesses' observations.

2. *Evidence falling within an exception to the hearsay rule.* Gillen's statements to a number of persons that she was scared of Newell, that she feared for her safety, that she planned to leave Newell, and that she was afraid if she left Newell, he would keep the baby from her were admissible under an exception to the hearsay rule for "then existing mental, emotional, or physical condition." Iowa R. Evid. 5.803(3). Rule 5.803(3) provides for an exception to the hearsay rule for

[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed....

The admission of such evidence under this exception is dependent upon the relevancy of the declarant's then existing state of mind, emotion, sensation, or physical condition. *See Buenaventura,* 660 N.W.2d at 51. Gillen's emotional state was relevant in this case to rebut the defendant's position that he and the victim had a loving relationship, as we discuss in more detail below.

Gillen's statement to her estranged husband that Newell was listening to their conversation was also admissible under an exception to the hearsay rule. Iowa Rule of Evidence 5.803(1) provides that "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter" is not excluded by the hearsay rule. Gillen's statement to her husband falls within this exception.

3. *Erroneously admitted hearsay—prejudice analysis.* Although some of the hearsay statements admitted by the court are not subject to a readily identifiable exception, we do not think the admission of this testimony was prejudicial. *See* Iowa R. Evid. 5.103(*a*) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected...."). Rule 5.103(*a*) requires a harmless error analysis where a nonconstitutional error is claimed. *State v. Sullivan,* 679 N.W.2d 19, 29 (Iowa 2004). To determine whether the error is harmless we ask: " 'Does it sufficiently appear that the

rights of the complaining party have been injuriously affected by the error or that he has suffered a miscarriage of justice?' " *Id.* (citation omitted). "[W]e presume prejudice—that is, a substantial right of the defendant is affected—and *reverse* unless the record affirmatively establishes otherwise." *Id.* at 30.

In considering whether the admission of hearsay is reversible error, we have held that notwithstanding the presumption of prejudice from the admission of such evidence, the erroneously admitted hearsay will not be considered prejudicial if substantially the same evidence is properly in the record. *State v. Hildreth,* 582 N.W.2d 167, 170 (Iowa 1998). That is the situation here with respect to Gillen's statements that Newell would not let her take the baby out alone and that he had her on a timetable. Jim McClain testified without objection to his observations of Newell's controlling behavior with respect to Gillen:

> One observation of Jerry being controlling was with their infant baby. If ... the baby could not stay directly with him, he would leave the baby with his mother. He ... wouldn't let Kathy take the baby, because he was worried that Kathy wouldn't come back.

Likewise, the fact that the couple was not getting along could be easily gleaned from the admissible testimony, making Gillen's statements to that effect cumulative and their admission harmless error.

The most troublesome hearsay statements erroneously admitted are Gillen's assertions that a large bruise on her head was caused by being head-butted by the defendant. This court has held, however, that no prejudice will be found where the evidence in support of the defendant's guilt is overwhelming. *See State v. Holland,* 485 N.W.2d 652, 656 (Iowa 1992)

(holding prejudice was not shown due to "the overwhelming evidence, albeit much of it circumstantial, connecting [the defendant] with the charged crimes"); *cf. State v. Brodene*, 493 N.W.2d 793, 797 (Iowa 1992) (holding evidentiary error that violated the defendant's right of confrontation was harmless beyond a reasonable doubt where "other clear evidence overwhelmingly established [the defendant's] guilt"). Considering the evidence that was properly admitted, we think the record affirmatively establishes a lack of prejudice in this case.

The medical evidence showed Gillen's death was not accidental and that she died from being strangled and beaten. Newell was the only other adult at home at the time of Gillen's death, but he did not call for assistance. Neighbors heard arguing and screaming just before they saw the defendant speeding away from the residence in his car. Subsequently, Newell gave several different versions of what had happened, lamented to family and friends that he was probably in trouble and might be charged with murder, and tried to convince his friend, Jim McClain, to lie about what happened on the night of Gillen's death. Moreover, one of the explanations given by the defendant for the victim's injuries was his statement to his jail mate that *just prior to Gillen's death* Newell "head butted [Gillen] twice and she fell to the floor." Given the strength of the properly admitted evidence, including Newell's own admissions, we think the defendant was not injuriously affected by the hearsay testimony that he had head-butted Gillen on a prior occasion, nor did he suffer a miscarriage of justice from the admission of this evidence. The State has established a lack of prejudice. ·

■■■■■ D. *Prior-acts evidence.* Rule 5.404(*b*) governs the admissibility of a per-

son's other crimes, wrongs, or acts. This rule provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of the person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Iowa R. Evid. 5.404(*b*). In order to be admissible, the evidence must be probative of " ' "some fact or element in issue other than the defendant's criminal disposition." ' " *State v. Taylor*, 689 N.W.2d 116, 123 (Iowa 2004) (citation omitted). "Moreover, ... when prior-bad-acts evidence is offered 'to establish an ultimate inference of mens rea, the court should require the prosecutor to "articulate a tenable non-character theory of logical relevance." ' " *Id.* at 123–24 (citation omitted). *See generally* Iowa R. Evid. 5.401 (stating evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). "If a court determines prior-bad-acts evidence 'is relevant to a legitimate factual issue in dispute, the court must then decide if its probative value is *substantially* outweighed by the danger of unfair prejudice to the defendant.' " *Taylor*, 689 N.W.2d at 124 (citation omitted). Evidence that is unfairly prejudicial is evidence that has " 'an undue tendency to suggest decisions on an improper basis commonly, though not necessarily, an emotional one.' " *State v. Plaster*, 424 N.W.2d 226, 231 (Iowa 1988) (citation omitted); *accord State v. Rodriquez*, 636 N.W.2d 234, 240 (Iowa 2001). Because the weighing of probative value against probable prejudice is not an exact science, we give a great deal of leeway to the trial judge who must make

this judgment call. *Rodriquez*, 636 N.W.2d at 240.

The testimony outlined above showed the following prior acts by the defendant: he called the victim derogatory names, he head-butted her, he inflicted bruises on her arms, he listened to her phone conversation with her estranged husband, he would not let her go anywhere alone with the baby, and he kept Gillen on a timetable. We must first determine whether this evidence is relevant to a legitimate issue in the case other than a general propensity by the defendant to commit wrongful acts. *Taylor*, 689 N.W.2d at 124. The defendant argues he did not raise a defense of mistake or accident, and therefore, evidence that he had intentionally hurt Gillen in the past was irrelevant.

An essential element of first-degree murder is malice aforethought. *See State v. Lee*, 494 N.W.2d 706, 707 (Iowa 1993); *see also* Iowa Code § 707.1 ("A person who kills another person with malice aforethought either express or implied commits murder."). "Malice aforethought" is defined as " 'a fixed purpose or design to do some physical harm to another that exists before the act is committed.' " *Buenaventura*, 660 N.W.2d at 49 (citation omitted). "Because this element is a state of mind, circumstantial evidence is generally used to prove malice." *Id.* We have held the prior relationship between the defendant and the victim, including bad feelings, quarrels, and physical acts, is a circumstance that may be shown to prove the defendant's state of mind and motivation at the time of the crime. *See Taylor*, 689 N.W.2d at 128 (stating "defendant's prior acts of violence toward his wife [were] relevant to his motive and intent on the day [of the alleged assault]"); *Buenaventura*, 660 N.W.2d at 49 (same); *State v. Kellogg*, 263 N.W.2d 539, 542 (Iowa 1978) (same).

The court's instruction to the jury defining this element was consistent with these legal principles. The jury was instructed:

"Malice" is a state of mind which leads one to intentionally do a wrongful act to the injury of another or in disregard of the rights of another out of actual hatred, or with an evil or unlawful purpose. It may be established by evidence of actual hatred, or by proof of a deliberate or fixed intent to do injury. It may be found from the acts and conduct of the Defendant and the means used in doing the wrongful and injurious act. Malice requires only such deliberation that would make a person appreciate and understand the nature of the act and its consequences, as distinguished from an act done in the heat of passion.

"Malice aforethought" is a fixed purpose or design to do some physical harm to another which exists before the act is committed. It does not have to exist for any particular length of time.

Although motive is not a necessary element of murder, lack of motive may be considered in determining whether the Defendant acted with malice aforethought.

We think the evidence challenged here was highly relevant to the issue of malice aforethought because it showed the relationship between the defendant and the victim and was pertinent to the defendant's possible motive for beating and strangling Gillen. If Newell and Gillen had an acrimonious relationship, it is more probable that Newell acted with malice—a fixed purpose to do harm—at the time of Gillen's death than if they had a loving relationship. Similarly, if Newell was possessive and controlling of Gillen, it is more likely that he acted with a fixed purpose to do physical harm to her when she returned home after an inordinately long and unexplained absence. In considering

the admission of similar evidence in a prosecution for domestic abuse assault and burglary, we stated:

> [T]he defendant's prior conduct directed to the victim of a crime, whether loving or violent, reveals the emotional relationship between the defendant and the victim and is highly probative of the defendant's probable motivation and intent in subsequent situations.

The most obvious example of the legitimate use of prior-bad-acts evidence is the admission of evidence of a defendant's prior assaults of a victim in a prosecution of the defendant for the subsequent murder of the victim. Courts have admitted such evidence to show the defendant's motive and intent with respect to the actions giving rise to the charged crime when intent is disputed. *Taylor,* 689 N.W.2d at 125 (citations omitted); *accord White,* 668 N.W.2d at 855 (finding no abuse of discretion in admission of defendant's prior assault on victim in prosecution for first-degree kidnapping and first-degree burglary); *State v. Emerson,* 375 N.W.2d 256, 260 (Iowa 1985) (admitting evidence of prior quarrels between defendant and victim in prosecution of defendant for first-degree murder); *Kellogg,* 263 N.W.2d at 542 (same).

Contrary to the defendant's claim on appeal, we think the element of intent—malice aforethought—was contested at trial. Newell told the police he had a loving relationship with the victim, and several of the defendant's versions of what happened that night portrayed Gillen's death as accidental. In closing arguments, defense counsel repeatedly suggested that the relationship between the defendant and Gillen was amicable, and that the State had failed to establish the defendant's malice or ill will toward the victim. Because the defendant's intent to do harm to Gillen was in dispute and because the evidence in question was probative of the defendant's relationship with Gillen and his possible motive for harming her, the State articulated a tenable noncharacter theory of logical relevance to support admission of this evidence.

We turn to the question of prejudice: is the probative value of this evidence *substantially* outweighed by its prejudicial effect? In balancing probative value against prejudicial effect, the court considers

> the need for the evidence in light of the issues and the other evidence available to the prosecution, whether there is clear proof the defendant committed the prior bad acts, the strength or weakness of the evidence on the relevant issue, and the degree to which the fact finder will be prompted to decide the case on an improper basis.

*Taylor,* 689 N.W.2d at 124.

Our examination of the record shows a need for the challenged evidence. Although there was strong circumstantial evidence that Newell was the person who committed the act that killed Gillen, the prosecution had the additional burden to prove the defendant acted with malice aforethought, or ill will, at the time of Gillen's death. The only other evidence indicating malice was the manner in which Gillen was killed. We think evidence of the abusive and controlling nature of the relationship between Newell and Gillen was strong evidence of Newell's emotional and mental state at the time of Gillen's death, as well as his motive for murdering the mother of his child. Moreover, we agree with our observation in *Taylor* that a defendant should not be allowed to have his guilt or innocence determined " 'on a false presentation that his and the victim's relationship [was] peaceful and friendly.' " *Id.* at 130 (citation omitted). Here, the defense sought to establish that Newell

loved Gillen and bore her no ill will. Therefore, the State needed, and was entitled, to rebut this argument with evidence to the contrary.

■ "In assessing whether there is clear proof of prior misconduct, it is not required that the prior act be established beyond a reasonable doubt, nor is corroboration necessary." *Id.* "There simply needs to be sufficient proof to ' "prevent the jury from engaging in speculation or drawing inferences based on mere suspicion." ' " *Id.* (citation omitted). Here, there was clear proof of name-calling in that several witnesses to these acts confirmed such occurrences. Similarly, various witnesses observed signs of physical abuse and given the context of these observations and the victim's well-documented fear of the defendant, we do not think the jury would have to speculate that Gillen's injuries were caused by Newell. Finally, evidence of Newell's controlling behavior with respect to Gillen also came from several sources. We think there was clear proof the defendant committed the prior acts attributed to him.

■ Balanced against the need for the evidence, its reliability, and its probative strength is the danger of unfair prejudice. In evaluating the prejudice factor, we consider the likelihood that the prior-acts evidence will prompt the jury to base its decision on an improper emotional response toward the defendant. *Id.* Certainly the evidence of Newell's name-calling and violence reflected adversely on him and probably made him an unsympathetic character in the jury's eyes. Nonetheless, this evidence was essential to the truth-seeking function of the jury. *See id.* (stating " '[a] trial is a search for the truth,' " and thus, defendant's other acts are admissible to show his true relationship with the victim (citation omitted)). Therefore, the trial court was well within the bounds of

permissible discretion in determining any danger of unfair prejudice did not substantially outweigh the high probative value of the challenged evidence. *See White,* 668 N.W.2d at 855 (finding trial court acted reasonably in admitting evidence of defendant's prior assault of victim notwithstanding that "the jury could have been swayed by unfair prejudice from the admission of the evidence").

### III. Testimony Concerning Statements Made by Mary Culbert.

■ A. *The defendant's claim.* The defendant objected to the admission of the recording of Culbert's 911 call and the testimony of four witnesses, all of which revealed statements made by Culbert on the night Gillen died. Newell claims the admission of his mother's out-of-court statements violated the Confrontation Clause because Culbert had died by the time of trial; thus, her statements were not subject to cross-examination by the defense. We review claims based on the Confrontation Clause de novo. *State v. Hallum,* 606 N.W.2d 351, 354 (Iowa 2000). The defendant also challenges these statements as irrelevant and inadmissible hearsay. We review the latter claims for correction of errors of law. *See Buenaventura,* 660 N.W.2d at 50.

Much of the testimony to which the defendant objected was admitted by the trial court under an exception to the hearsay rule for excited utterances. *See* Iowa R. Evid. 5.803(2) (excluding from the hearsay rule "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition"). Although we base our decision on a different rationale, we find no reversible error in the trial court's ruling. *See DeVoss v. State,* 648 N.W.2d 56, 62–63 (Iowa 2002) (stating appellate court can affirm eviden-

tiary ruling on any ground raised on appeal). As we discuss below, we conclude (1) the challenged testimony was admissible because it was not hearsay or, (2) to the extent it did constitute hearsay, its admission was not prejudicial. Under both conclusions, the court's allowance of Culbert's out-of-court statements did not violate the Confrontation Clause.

 B. *General legal principles.* The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI; *see also Pointer v. Texas,* 380 U.S. 400, 406, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923, 927–28 (1965) (stating this procedural guarantee is applicable to state prosecutions). Two important policies underlie the Confrontation Clause: "a preference for face-to-face confrontation at trial and the right of cross-examination." *State v. Castaneda,* 621 N.W.2d 435, 444 (Iowa 2001). Although this constitutional provision generally protects the same values as the hearsay rule, "the Confrontation Clause bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." *Id.* On the other hand, the Confrontation Clause, like the hearsay rule, does not prevent "the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford v. Washington,* 541 U.S. 36, 59 n. 9, 124 S.Ct. 1354, 1369 n. 9, 158 L.Ed.2d 177, 198 n. 9 (2004).

 The United States Supreme Court recently discussed the parameters of the Confrontation Clause in *Crawford.* While not confining this provision to testimonial statements of out-of-court declarants, the Court concluded "testimonial hearsay" was the "primary object" of the Sixth Amendment. *Id.* at 53, 60, 124 S.Ct. at 1365, 1370, 158 L.Ed.2d at 194, 199. Included in the category of testimonial statements is "prior testimony at a preliminary hearing, before a grand jury, or at a former trial ... and to police interrogations." *Id.* at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203. The Court suggested that a casual or off-hand remark to an acquaintance may be excludable under the hearsay rule, but "bears little resemblance to the civil-law abuses the Confrontation Clause targeted." *Id.* at 51, 124 S.Ct. at 1364, 158 L.Ed.2d at 192.

More importantly, the Court differentiated the test for admissibility depending upon whether the out-of-court statement is testimonial. Testimonial statements may be admitted only if the declarant is unavailable and only if the defendant has had a prior opportunity for cross-examination. *Id.* at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203. As for nontestimonial hearsay, the Court observed that it would be consistent with "the Framers' design to afford the States flexibility in their development of hearsay law" to "exempt[ ] such statements from Confrontation Clause scrutiny altogether" or to apply the principles set forth in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). *Id.* The Court summarized *Roberts* as holding the Confrontation Clause "does not bar admission of an unavailable witness's statement against a criminal defendant if the statement bears 'adequate "indicia of reliability," ' " a test met when the evidence "either falls within a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness.' " *Id.* at 40, 124 S.Ct. at 1358, 158 L.Ed.2d at 186 (quoting *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2531, 65 L.Ed.2d at 608). The Court was clear, however, that the *Roberts* test was not applicable to testimonial hearsay. *Id.* at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203.

 Like the erroneous admission of hearsay, the admission of evidence in violation of the Confrontation Clause does not mandate reversal: if the State establishes that the error was harmless beyond a reasonable doubt, reversal is not required. *See State v. Brown,* 656 N.W.2d 355, 361 (Iowa 2003). To determine harmlessness, the inquiry "is not whether, in a trial that occurred without the error, a guilty verdict surely would have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182, 189 (1993). Several factors are relevant in assessing whether error was harmless:

> "[T]he importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross examination otherwise permitted, and, of course, the overall strength of the prosecution's case."

*Brown,* 656 N.W.2d at 361–62 (citation omitted).

 C. *Nontestimonial statements.* We will first discuss the nontestimonial statements made by Culbert that were introduced at trial. To determine whether this evidence violated the Confrontation Clause, we must decide (1) whether Culbert's statements were offered to prove the truth of the matter asserted, and if so, (2) whether these statements fall within a "firmly rooted hearsay exception" or bear other "particularized guarantees of trustworthiness." *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539, 65 L.Ed.2d at 608. If we conclude the admission of any of Culbert's nontestimonial statements violated the Sixth Amendment, we must then consider the question of prejudice.

 1. *The 911 call.* In the 911 tape recording, Culbert asked for an ambulance, and stated her daughter-in-law had fallen and was unresponsive. Culbert also indicated she was present when Gillen fell, stating her daughter-in-law had been drinking quite heavily.

The statements made by Culbert in this tape recording were not offered to prove the truth of the matter asserted. Rather, the prosecution sought to prove that Culbert attempted to cover-up for her son almost immediately. Therefore, the probative value of these statements rested on the fact they were made, not on whether her story about what happened was true. Because Culbert's statements in the 911 call were not hearsay, their admission did not violate the Confrontation Clause.

 2. *Scroggins' testimony.* Newell's sister and Culbert's daughter, Christine Scroggins, testified that Culbert called her from Newell's house and told her Gillen was dead. She said Culbert was "frantic," "freaking out," "in an uproar," and "upset." Culbert told Scroggins to come to Newell's house. According to Scroggins, Culbert "kept saying something about a dinner plate." The defendant claims he was prejudiced by the erroneous admission of Culbert's statement that Gillen was dead and Culbert's reference to "something about a dinner plate."

We do not consider whether either of these statements is inadmissible hearsay because, even if they are, their admission cannot be deemed prejudicial to Newell. Evidence that the victim was dead when Culbert called 911 was already in the record from numerous sources. Therefore, Scroggins' testimony to the same fact was not prejudicial. *See State v. Whitfield,* 315 N.W.2d 753, 755 (Iowa 1982) (holding that when same evidence is already in the record, admission of hearsay is not prejudi-

cial). The second objectionable statement was elicited as follows:

> Q. . . . when—you were trying to calm [Culbert] down, she's hysterical, did she say anything to you about what happened?
>
> A. She kept saying something about a dinner plate..

At this point, the defendant's objection to any further testimony on this matter was sustained. Newell claims on appeal Scroggins' testimony implied there had been a fight between himself and Gillen that involved the throwing of dinner plates. We think the solitary reference to a dinner plate was so vague and nonspecific that it cannot be considered prejudicial.

■ 3. *Jones's testimony.* Culbert's friend, Donna Jones, testified that Culbert was at Jones's house the night Gillen died. She testified that Jonathan Newell called Jones's house looking for Culbert. After Culbert spoke with her son, Culbert tossed the phone down, stated she had to leave, and said something to the effect "Kathy" and "dead." Jones also testified that a few days later she and Culbert disagreed about what Culbert had told Jones at the time of the phone call from Jonathan.

■ Culbert's statement when she left Jones's house is too vague to be prejudicial. It is not clear whether Culbert thought Gillen was already dead or whether she had been told Gillen might be dead. In either event, these statements were cumulative of other admissible evidence that Gillen was or might have been dead when Newell attempted to reach his mother. Therefore, Newell was not prejudiced by Jones's testimony that Culbert said "Kathy" and "dead." Jones's testimony that she and Culbert disagreed about what Culbert told Jones on the night of Gillen's death is clearly not hearsay. Any implied statement made by Culbert in her later conversation with Jones was offered to

demonstrate Culbert's efforts to cover-up for her son, not to prove the truth of what she said.

■ 4. *Hamlin's testimony.* Culbert's sister, Evelyn Hamlin, also testified. She said that on the night Gillen died, she was called to come to Newell's house to help Culbert. According to Hamlin, Culbert was very distressed, was crying, and kept saying "it's not true." Hamlin testified that Culbert told her that Newell had told Culbert that he had been watching the baby, that Gillen went out to get food, that when Gillen came back Gillen was mad at the defendant and threw some sandwiches on the table, saying "there's your food," and headed for the back door. As with the testimony of Jones, the prior statements made by Culbert were offered to show that they were made, not to prove the truth of the matter asserted. Because they are not hearsay, their admission does not violate the Confrontation Clause.

D. *Testimonial statements.* We now consider the testimony of two police officers who talked with Culbert on the night of Gillen's death.

■ 1. *Officer Chapman's testimony.* Officer Joseph Chapman testified that when he was at the scene of the crime, Culbert told him that Newell had asked her to check on Gillen because Gillen was not feeling well. Culbert told the officer that she had been with Gillen for about one-half hour prior to the incident. She further stated that although Culbert was at the house when Gillen fell, Newell was not. The officer testified that at the time these statements were made, Culbert was very excited and at times "temporarily out of control" emotionally. The court instructed the jury that Culbert's statements to officer Chapman were not to be considered for the truth of the matter asserted.

Notwithstanding the testimonial nature of Culbert's statements to the officer, their admission does not violate the Confrontation Clause because the statements are not hearsay. Culbert's explanation of what happened on the evening of Gillen's death was not offered to prove that what Culbert stated actually occurred, but rather to show that Culbert was aware that something had happened between her son and the victim and Culbert was trying to protect him by offering an exonerating picture of the event.

2. *Detective Moller.* The final witness testifying to statements made by Culbert was Detective Lynn Moller. The detective testified to essentially the same statements and observations as did officer Chapman. In addition, detective Moller spoke with Culbert a second time, after he had returned from looking for Newell. During the second conversation, Culbert changed her story. She admitted she had not spent time with Gillen that evening, and that Gillen was already on the floor when Culbert arrived. Culbert asserted she lied because she was afraid Newell would be in trouble for not calling 911.

The detective's recitation of Culbert's first version of events was not hearsay because Culbert's statement that she was with Gillen prior to and at the time of Gillen's collapse was not offered to prove the truth of these assertions. In contrast, Culbert's subsequent version of what had occurred was offered to prove the truth of the matter asserted, namely, that Gillen was already injured, if not dead, when Culbert arrived and Culbert was worried her son would be in trouble for leaving the scene. This information was, however, merely cumulative of Newell's own statements to the police that Gillen collapsed while he was home and that he tried to revive her, panicked, and left. *See Brown,* 656 N.W.2d at 361 (finding no

prejudice from admission of evidence in violation of hearsay rule and Confrontation Clause where same evidence was in the record through the defendant's own admissions to jail mates). Moreover, these facts were essentially undisputed at trial. *See In re Detention of Palmer,* 691 N.W.2d 413, 422 (Iowa 2005) ("No prejudice results from erroneous admission of evidence on an issue that is undisputed."). The dispute at trial centered not on the fact of Newell's involvement in Gillen's death, which was the critical fact contained in Culbert's later statement to the detective; the dispute in the case centered on the *nature* of Newell's involvement. Under these circumstances, we think the jury's guilty verdict was surely unattributable to this evidence, and therefore, its admission was harmless beyond a reasonable doubt.

## IV. *Testimony of Expert on Domestic Violence.*

A. *Challenged testimony.* Over the defendant's objection, the court allowed the testimony of Lieutenant David Taylor, who had previously been an investigator for the domestic abuse response team for three years. Taylor explained the issues of power and control involved in domestic violence. He stated the use of intimidation, emotional abuse, isolation of the victim, blaming the victim, using children as pawns, economic abuse, coercion, and threats are aspects of abusive domestic relationships, although not all attributes are present in every situation. Taylor also described the continuum of violence and the potential that domestic violence will escalate. Finally, he testified about the reasons women stay in abusive and violent relationships. The witness was not asked, nor did he testify, about the relationship between Newell and Gillen or any aspect of the case at hand.

The defendant challenged Taylor's qualifications to give the described testimony. He also claimed that the authority upon which this witness relied included materials prepared for law enforcement training that were not subject to peer review. In addition, Newell argued the evidence was irrelevant and to the extent it was relevant, its prejudicial effect as thinly disguised propensity evidence outweighed its probative value.

B. *Applicable legal principles.* We review the admission of expert testimony for an abuse of discretion. *Rodriquez,* 636 N.W.2d at 245. The court's ruling is considered in light of " '[t]he general rule in this jurisdiction ... of liberality in the admission of opinion evidence.' " *Id.* (citation omitted). We are also guided by our rules of evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Iowa R. Evid. 5.702.

C. *Discussion.* Contrary to the defendant's assertion, Taylor was sufficiently qualified in the area of his testimony. He had extensive training in domestic abuse, met with approximately 500 victims of domestic violence a year in his capacity as an investigator, trained others in the area of domestic abuse, and received two awards for his work with domestic violence victims. *See State v. Belken,* 633 N.W.2d 786, 800 (Iowa 2001) (stating witness's education, training and experience qualified him as an expert; witness's technical ability went to weight of his testimony, not its admissibility). The defendant's criticism of the authorities upon which Taylor relied is also an insufficient basis upon which to disqualify Taylor as an expert. These authorities were not shown to be unreliable, and the jury could consider the lack of peer review in determining the weight to give to Taylor's testimony. *See State v. Kolbet,* 638 N.W.2d 653, 660 (Iowa 2001) (stating reliability of expert's opinions is for the jury to determine).

We also think Taylor's testimony was relevant. Newell claimed Gillen's injuries were accidental. In addition, his attorney, in closing argument, tried to portray Gillen and Newell's relationship as loving and caring, and vehemently disputed any evidence of malice. As we discussed earlier in connection with the prior-acts evidence, an understanding of the relationship between Gillen and Newell was essential to the jury's ability to determine Newell's state of mind on the night of Gillen's death and what might have motivated him to beat and strangle her. *Cf. Rodriquez,* 636 N.W.2d at 246 (upholding admission of expert on battered women's syndrome in prosecution of defendant for the assault and kidnapping of his girlfriend); *State v. Gettier,* 438 N.W.2d 1, 5–6 (Iowa 1989) (finding no abuse of discretion in admission of expert testimony concerning post-traumatic stress disorder in sexual-abuse prosecution).

We also conclude the probative value of this evidence is not substantially outweighed by its prejudicial effect. *See* Iowa R. Evid. 5.403 (allowing court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice"). The expert's explanation of the dynamics of domestic violence was not *unfairly* prejudicial to the defendant as required by rule 5.403. The expert's testimony would have an adverse effect on Newell's defense *only* to the extent it had probative value. The expert never testified that Gillen was a victim of

domestic violence. That determination was left to the jury. Consequently, only if the jury decided the relationship between Newell and Gillen could be explained or aptly interpreted by the principles described by the expert would the expert's testimony be prejudicial to the defendant. But this type of prejudice is inherent in any evidence that is probative of a material issue. Therefore, we do not think this evidence was unfairly prejudicial so as to outweigh its value as probative evidence.

## V. *Instructions on Malice Aforethought.*

■ The defendant claims the trial court erred in instructing the jury that malice could be inferred from the commission of one of the underlying felonies that served as the basis for submission of the felony murder alternative of the first-degree murder charge: willful injury, participation in assault causing serious injury, and domestic abuse assault. He argues this instruction essentially told the jury that it was not required to find malice aforethought if its verdict rested on one of the felony alternatives. Newell also contends the inference of malice from the commission of these particular felonies is improper because malice is not an element in any of these crimes and specific intent is required in only one of them.

■ We review the defendant's claim of instructional error for the correction of errors of law. *See State v. Piper,* 663 N.W.2d 894, 915 (Iowa 2003). In addition, in evaluating the correctness of any particular instruction, we do not consider it in isolation, but in the context of all the instructions. *See State v. Fintel,* 689 N.W.2d 95, 104 (Iowa 2004) ("Jury instructions are not considered separately; they should be considered as a whole.").

The marshalling instruction for the first-degree murder charge provided in pertinent part:

The State must prove all of the following elements of Murder in the First Degree:

1. That on or about June 15, 2001, the defendant hit and/or strangled Kathleen Gillen.

2. Kathleen Gillen died as a result of being hit and/or strangled.

3. *The Defendant acted with malice aforethought.*

4.(a) The Defendant acted willfully, deliberately, premeditatedly, and with a specific intent to kill Kathleen Gillen.

**OR**

4.(b) The Defendant was participating in the offense of Willful Injury as explained in Instruction No. 29.

**OR**

[The instruction continues with other alternatives for felony murder based on participation in assault causing serious injury and participation in domestic abuse assault.]

(First emphasis added.) Contrary to the defendant's assertions, this instruction clearly told the jury that it was required to find malice aforethought under any of the alternatives for first-degree murder. Furthermore, the instruction defining "malice" and "malice aforethought" included the following statement: "[Malice] may be found from the acts and conduct of the Defendant and the means used in doing the wrongful and injurious act." Consistently with this instruction, the court also told the jury in another instruction: "You may, but are not required to, infer malice from the commission of a Willful Injury or Assault Causing Serious Injury or Assault Domestic Abuse which results in death."

We do not think the latter instruction, stating that malice *may be inferred* from the specified conduct, is the equivalent of telling the jury that malice need not be present at all. Here, before the jurors could convict the defendant of first-degree murder, they were required to find that the defendant acted with "a fixed purpose or design to do some physical harm to [Gillen]." The commission of a forcible felony was simply one factor from which the defendant's state of mind could be determined. Contrary to the defendant's argument, the instructions did not eliminate the requirement of malice aforethought under the felony murder alternatives of first-degree murder. The instructions simply informed the jury of the relevancy of the defendant's actions to the existence of malice. Moreover, there is no requirement that the underlying felony include malice or specific intent as an element in order for the defendant's criminal conduct to be relevant to the issue of malice. *See State v. Oliver*, 341 N.W.2d 744, 748 (Iowa 1983). We hold the trial court properly instructed the jury.

## VI. *Domestic Abuse Assault as Predicate Offense for Felony Murder.*

■ The defendant claims error in the trial court's refusal to dismiss the felony murder charge based on third-offense domestic abuse assault. He argues third-offense domestic abuse assault is a felony only due to the fact that the offense was committed at least three times; without this prior-crimes sentencing enhancement, domestic abuse is a misdemeanor. *See* Iowa Code § 708.2A(2)(*b*) ("On a first offense of domestic abuse assault, the person commits ... [a] serious misdemeanor, if the domestic abuse assault causes bodily injury or mental illness."), .2A(4) ("On a third or subsequent offense of domestic abuse assault, a person commits a class

"D" felony."). Newell contends the legislature did not intend that a felony murder be based on a misdemeanor offense for which repeat offenders are sentenced as felons. *See id.* §§ 707.2(2) (stating a person commits murder in the first degree if "[t]he person kills another person while participating in a forcible felony"), 702.11(1) (defining a "forcible felony" to include a felonious assault). We need not address this issue because Newell suffered no prejudice from the submission of this alternative. *See Rodriquez*, 636 N.W.2d at 239 n. 1 (refusing to reverse defendant's convictions based on alleged error in submission of attempted murder charge because defendant was not prejudiced: he was acquitted of attempted murder charge and had not established that the challenged offense "infected his convictions of the other offenses").

To avoid possible prejudice from proof of Newell's prior convictions for domestic abuse assault, the trial court decided to submit the "third-offense" element of third-offense domestic abuse assault to the jury only if the jury convicted the defendant of first-degree murder and only if the jury relied solely on the domestic abuse assault alternative to do so. In its verdict, the jury indicated in response to a special interrogatory that no member of the jury had "relied solely and exclusively on the theory of participation in Assault Domestic Abuse" to convict the defendant of first-degree murder.

■ Newell argues that even if the jury verdict establishes that he was not convicted of first-degree murder based solely on the domestic-abuse-assault alternative, he was still prejudiced by the submission of this theory because it opened the door to proof of Newell's prior bad acts against the victim. But as our discussion of the defendant's challenge to the admis-

sion of prior-acts evidence explains, this evidence was relevant to the malice afore-thought element of murder, an element common to all alternatives of first-degree murder. Consequently, even if domestic abuse assault had not been included in the first-degree murder instruction, the prior-acts evidence would still have been admissible. Therefore, the defendant has failed to show that any error in the submission of the domestic-abuse-assault theory infected his first-degree murder conviction.

## VII. Ineffective–Assistance–of–Counsel Claim—Improper Bolstering of Witness's Testimony.

A. *General principles.* We have previously summarized the principles governing our consideration of ineffective-assistance-of-counsel claims asserted on direct appeal of the defendant's conviction. They are:

Two elements must be established to show the ineffectiveness of defense counsel: (1) trial counsel failed to perform an essential duty; and (2) this omission resulted in prejudice. A defendant's inability to prove either element is fatal.

"Generally, ineffective-assistance claims are preserved for postconviction relief proceedings to afford the defendant an evidentiary hearing and thereby permit the development of a more complete record." If the record on appeal shows, however, that the defendant cannot prevail on such a claim as a matter of law, we will "affirm the defendant's conviction without preserving the ineffective-assistance-of-counsel claims." Conversely, if the record on appeal establishes both elements of an ineffective-assistance claim and an evidentiary hearing would not alter this conclusion, we will reverse the defendant's conviction and remand for a new trial.

*State v. Graves,* 668 N.W.2d 860, 869 (Iowa 2003) (citations omitted).

The defendant claims his trial counsel was ineffective in failing to object to a police officer's alleged improper bolstering of another witness's testimony. We conclude as a matter of law that the defendant cannot prevail on this claim.

B. *Discussion.* Newell argues on appeal that detective Moller improperly commented on the truth and veracity of a later witness, Jim McClain. This alleged bolstering occurred during defense counsel's cross-examination of Moller. Counsel questioned the detective about overtures made to McClain to assist in the prosecution of other cases. In response, Moller stated:

A. No. But what I recall is ... McClain stating, "I realize I'm probably not going to get" ... "I'm probably not going to get anything out of this, but I knew Kathy. She was a decent gal. She didn't deserve this...."

Further questioning on this topic elicited similar testimony. In addition, the defense complains about the following testimony of Moller:

Q. Would you believe anything he [McClain] told you? A. If it can be corroborated, yes. I'm not saying—in police work, anybody you talk with you try to corroborate what they say, whether it be a citizen off the street or somebody in the Black Hawk County jail.

The defendant claims these answers were improper opinion testimony about the veracity of witness McClain, who testified for the prosecution. *See State v. Brotherton,* 384 N.W.2d 375, 378 (Iowa 1986) (holding expert cannot testify on matters "'that either directly or indirectly render an opinion on the credibility or truthfulness of a witness'" (citation omitted)); *cf. State v. Hulbert,* 481 N.W.2d 329, 332 (Iowa 1992) (holding opinion evidence may not be employed as a direct comment on the guilt or innocence of the defendant).

Moller's testimony about McClain's remarks was not an improper comment on McClain's veracity, because Moller simply reiterated McClain's professed reasons for coming forward to testify. Moller did not state whether he believed these reasons were McClain's true motivation. Because there would have been no merit to an objection that the witness improperly commented on the veracity of another witness, trial counsel was not ineffective as a matter of law for failing to make this objection. *See Taylor*, 689 N.W.2d at 134 (stating counsel has no duty to make an objection that lacks merit).

We do not decide whether trial counsel failed to perform an essential duty when he did not object to Moller's second comment—that Moller would believe McClain if McClain's testimony could be corroborated—because no prejudice resulted from the admission of this testimony. Moller's comment was at most a lukewarm endorsement of McClain's veracity. Moreover, Moller testified that in police work, one corroborates everyone's testimony, implying that he considered McClain no more or less trustworthy than any other witness. Given the overwhelming evidence against the defendant, there is no reasonable probability—as a matter of law—that, but for the admission of this evidence, the outcome of the trial would have been any different. *See id.* (stating defendant must show " 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different' " (citation omitted)).

VIII. *Testimony Regarding Defendant's Incarceration for Drug Offense.*

The defendant assigns as error the trial court's refusal to grant a mistrial after the defendant's jail mate, Eric Pasket, testified to the defendant's incarceration on "drug charges." When Pasket was asked, "What did [Newell] say he was in there for?" Pasket responded, "He was in there for drug charges and murder charge." The defendant's attorney did not immediately object, not wanting to call attention to this testimony. At the next break and outside the presence of the jury, trial counsel requested a mistrial. The court denied the defendant's request, and pursuant to the defendant's wishes, did not admonish the jury to disregard the witness's statement.

The defendant claims the court erred in failing to grant a mistrial due to the prejudicial nature of the testimony. We review the court's ruling for an abuse of discretion. *See Piper*, 663 N.W.2d at 901. "A mistrial is appropriate when 'an impartial verdict cannot be reached' or the verdict 'would have to be reversed on appeal due to an obvious procedural error in the trial.' " *Id.* at 902. The pertinent question here is whether the trial court was clearly unreasonable in concluding an impartial verdict could be reached notwithstanding the witness's testimony that Newell said he was in jail on drug charges.

We do not think the court's exercise of its discretion was clearly unreasonable. The reference to drug charges occurred only once, and there were no questions that elaborated on this information. *See State v. Anderson*, 448 N.W.2d 32, 34 (Iowa 1989) ("It is of significance that the incident was isolated."). In addition, the court gave a general instruction to the jury admonishing the jurors not to consider evidence concerning other wrongful acts alleged to have been committed by Newell. *See State v. McMullin*, 421 N.W.2d 517, 520 (Iowa 1988) (stating jurors are presumed to have followed the court's instruc-

tions absent evidence to the contrary). Finally, the evidence against the defendant was strong. *See State v. Greene*, 592 N.W.2d 24, 32 (Iowa 1999) (considering strength of evidence in concluding no prejudice warranting a mistrial); *Anderson*, 448 N.W.2d at 34 (same). When the solitary reference to drug charges is considered in the context of the entire trial and all the properly admitted evidence, we think the trial court reasonably concluded this comment did not prevent the defendant from receiving a fair trial with impartial jurors.

## IX. *Change of Venue.*

■ In his pro se brief, Newell asserts the trial court erred in denying his request for a change of venue based upon adverse trial publicity.[1] The defendant's request for a change of venue was based upon a local newspaper article and some television and radio reports broadcasted during the first and second day of jury selection.

■ The district court has authority to change the venue of a trial when the defendant demonstrates such a degree of prejudice in the county "that there is a substantial likelihood a fair and impartial trial cannot be preserved with a jury selected from that county." Iowa R.Crim. P. 2.11(9)(*b*). "[The] right to a fair trial by impartial jurors has its underpinnings in our state and federal constitutions." *State v. Siemer*, 454 N.W.2d 857, 860 (Iowa 1990). Therefore, our review is de novo. *Id.* "Reversal is warranted only where the trial court's decision demonstrates an abuse of discretion." *Id.*

Our de novo review of the record reveals that the defendant's claim has no merit. The newspaper article concerning the defendant's case was essentially factual in nature. Although the radio and television broadcasts were not introduced into evidence, from the answers given by prospective jurors during voir dire, it appears that publicity was also primarily fact based. Nonetheless, the newspaper article did refer to two items of evidence the trial court had ruled inadmissible: (1) a videotaped deposition of Mary Culbert; and (2) Newell's history of domestic violence.

As a result of the defendant's motion, the court extensively voir dired the jury panel. Only eight of the thirty-two persons on the panel had any exposure to the article. Four jurors read it, and they were excused. The other four prospective jurors saw the headlines and stopped reading the article as soon as they realized what it was. Each of these jurors stated the article did not affect his or her opinion and he or she could be impartial. Of the seven jurors who were later added to the panel, a few had exposure to media reporting of the case, but all believed they could be fair and impartial.

■ The media coverage of the defendant's case was not pervasive, nor was it inflammatory. Moreover, prejudice is not presumed based on some jurors' "mere exposure to news accounts." *Id.* at 861. We are convinced the trial court reasonably concluded based on the nature of the publicity and its voir dire of the panel that a fair and impartial trial could be obtained by the defendant in Black Hawk County. Therefore, the defendant has failed to show the court abused its discretion in denying his motion for change of venue.

## X. *Conclusion.*

We find no reversible error. Therefore, we affirm the defendant's conviction of first-degree murder.

**AFFIRMED.**

---

1. The defendant makes numerous other claims of error. We have considered these claims and conclude they either have no mer-it, error was not preserved, or they cannot be addressed on direct appeal.

All justices concur except CARTER, J., LAVORATO, C.J., and WIGGINS, J., who concur specially.

CARTER, Justice (concurring specially).

I join in the court's opinion in all aspects, except its treatment of the expert testimony of Lieutenant David Taylor. Although that testimony does not warrant reversal of Newell's conviction, given the strength of other evidence against him, it should not have been allowed by the district court.

The challenged testimony of Lieutenant Taylor explained the issues of power and control often involved in domestic violence and the use of intimidation, emotional abuse, isolation of the victim, blaming the victim, and threats. It suggested that domestic abuse may involve a continuum of violence and the potential that the violence will escalate. The majority opinion concludes that this testimony concerning the attributes of domestic abuse was helpful in aiding the jury's understanding of the relationship between Gillen and Newell for purposes of determining Newell's state of mind on the night of Gillen's death and what might have motivated him to beat and strangle her. I submit that this was an improper use of profiling evidence to establish Newell's guilt.

The situation in the present case is different from the uses of this type of testimony approved in *State v. Rodriquez,* 636 N.W.2d 234, 246 (Iowa 2001); and *State v. Griffin,* 564 N.W.2d 370, 374 (Iowa 1997). In those cases, the evidence was used to explain ambiguous conduct of the victims regarding the ability to flee from the perpetrator in a kidnapping prosecution and the reason for the recantation of the victim's statement in a domestic-abuse prosecution. In the present case, no similar issues were presented concerning the conduct of the victim.

With respect to Newell's state of mind, the majority opinion is implicitly referring to the State's need to prove malice. A jury's determination of the elements of a crime with which an accused is charged should be based entirely on the evidence presented in the case before the court and not based on the conduct of others under circumstances beyond the jury's knowledge or consideration. Moreover, the danger presented by such profiling evidence goes well beyond the issue of intent. There is also a strong possibility that a jury faced with Lieutenant Taylor's testimony concerning a continuum of violence and a potential for escalated violence might infer that Newell acted in conformity with the patterns of violence alluded to by the witness and inflicted the injuries that caused Gillen's death. The potential for misuse of this evidence far outweighs any benefit the jury might gain from its admission. It should have been excluded.

LAVORATO, C.J., and WIGGINS, J., join this special concurrence.