# IN THE COURT OF APPEALS OF IOWA

No. 16-0307
Filed June 7, 2017

**STATE OF IOWA,**
　　　　Plaintiff-Appellee,

**vs.**

**CHARLES EMANUEL HALL,**
　　　　Defendant-Appellant.
_____

　　　　Appeal from the Iowa District Court for Taylor County, John D. Lloyd, Judge.

　　　　The defendant appeals his convictions for murder in the first degree and child endangerment. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

　　　　Mark C. Smith, State Appellate Defender, and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

　　　　Thomas J. Miller, Attorney General, and Elisabeth S. Reynoldson, Special Counsel, for appellee.

　　　　Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**POTTERFIELD, Presiding Judge.**

Charles Hall appeals from his convictions for murder in the first degree and child endangerment causing serious injury. Hall maintains the district court abused its discretion when it denied his motion for mistrial after one of the State's witnesses vomited outside of the courtroom after a 911 call was played for the jury. Additionally, he maintains there was insufficient evidence to support his conviction for child endangerment resulting in serious injury.

**I. Background Facts and Proceedings.**

In July 2015, Hall was charged by trial information with murder in the first degree and child endangerment resulting in serious injury. His three-year-old daughter, J.K., was the alleged victim in each instance.

The charges were tried to a jury in January 2016.

The State's first witness was Hall's live-in girlfriend, April Clair. Clair testified J.K. had been staying with her and Hall because she wanted their daughter and J.K. to become acquainted. At Clair's urging, J.K. came to stay with Clair and Hall (and Clair's other children) in April 2015. During J.K.'s stay, Clair witnessed Hall using corporal punishment—hitting J.K. on the backs of her legs and hands with a piece of wood that was sometimes used to hold up windows in the home. At some point in May, Clair came home and noticed a burn on the side of J.K.'s face. Hall told Clair J.K. had knocked hot water from boiling hot dogs onto herself. J.K. was not taken to the doctor following the burn, but either Clair or Hall[1] put some type of ointment on the burn.

---

[1] It is not clear to us from Clair's testimony if she is speaking of herself or Hall when she testifies about the application of ointment.

Clair further testified that one of her children graduated from kindergarten on May 21. Clair, Hall, and the children spent the day with the family of Clair's cousin, Annette Wilson. Wilson and her family lived approximately one block from Clair and Hall's home, and the families often walked to visit each other. J.K. had been recovering from the flu or a bug of some type, and she acted tired and reserved all day. Hall and J.K. left Wilson's home shortly before Clair and the rest of the children. J.K. did not want to walk, and Hall picked her up, stating, "She's going to get her ass beat when she [gets] home if she's not going to walk."

When Clair got home with the other children, she went up to the bathroom on the second floor of the home, where Hall and J.K. were. When she opened the door, Clair saw J.K. standing in the tub without clothes on. Hall was holding the piece of wood he had previously used to hit J.K. Clair saw that J.K.'s "butt was raw," "[t]here was no skin on it." Clair also noticed an additional mark on J.K.'s face near her eye, which Clair thought looked like a carpet burn. When Clair asked Hall what had happened, he stated, "She needs to learn how to fucken listen." Clair noticed there was water in the tub and what appeared to be skin fragments in the water. J.K. was not taken to the doctor; Clair's nine-year-old daughter eventually helped J.K. out of the tub, and Clair put underwear on her.

The next morning, at approximately 8:30 a.m., Wilson called Clair and asked her to go to the grocery store for her. On the way out, Clair saw J.K. going to use the bathroom; she told J.K. she was leaving and Hall was downstairs. Then Clair left to go to Wilson's home, leaving only Hall and J.K. in the house.

Clair checked out at a local grocery store at 9:23 a.m. She then returned to Wilson's home, and Wilson cooked breakfast. At approximately 11:00 a.m.,[2] Clair left Wilson's to return home. As she walked up to her house, she saw Hall outside smoking a cigar. Hall did not have any cigars when Clair left, and later investigation showed Hall by himself purchasing the cigar from a nearby convenience store at 10:14 a.m. Clair asked Hall about J.K., and he stated she was up using the bathroom. Clair asked Hall to "get the car ready"—their vehicle had a flat tire—so they could take J.K. back to her mother's home in Chicago. At some point during the conversation, Hall walked off to go to a tire shop.

Clair walked into the home, looking for J.K; she found J.K. laying on her back on the bathroom floor. Clair picked her up and heard "[l]ike an exhale, a sigh or something." She carried J.K. into the dining room and set her down on the carpet. Once she laid J.K. down, Clair realized J.K. was not breathing and felt cold to the touch. Clair called Wilson at 11:33 a.m.; she then called one of Hall's friends twice—at 11:35 and 11:36—and then called 911 at 11:36.

At this point in the trial, the State offered into evidence the audio from Clair's 911 call and played it for the jury. The audio is forty-three seconds in length; in it, a person—the dispatcher—can be heard answering the 911 call, and then Clair asks for an ambulance to be sent to her address. The dispatcher repeats the address to Clair, and she confirms it. Clair is then asked what the problem is, and Clair responds, "My step-daughter, she's not breathing." The

---

[2] Clair testified she "think[s it was] about 11:00" when she left, but she did not look at a clock and did not know if it could have been later. Wilson testified Clair had only been gone five or ten minutes when she called at 11:33.

dispatcher confirms Clair's identity, and then Clair hangs up. Clair sounds upset during the call.

After the audio was played, the prosecutor asked the court for a short break. The court replied, "Why don't we go ahead and combine this with our afternoon recess. We'll be in recess for 15 minutes. Ladies and gentlemen, please remember that admonition. Leave your notepads on your chairs and be back in 15."

Approximately twenty-five minutes later, the court came back on the record outside the presence of the jury. The following exchange took place:

> DEFENSE ATTORNEY: Yes, Your Honor, thank you. Just prior to recessing court for our afternoon break, April Clair, the witness, essentially bolted and ran from the courtroom. She left the courtroom. The jury left the courtroom immediately behind her, and it's my understanding that April vomited in a trash can just outside the courtroom right in front of the jurors. She could be heard vomiting from the courtroom. I heard it. I believe [the prosecutor] heard it. The defendant heard it.
>
> Based on that, Your Honor, we believe that the defendant's opportunity to receive a fair trial has been [severely] compromised, and we would move for a mistrial at this time.
>
> It is difficult enough trying to base this on the facts and—not facts, the evidence that is put forth in the courtroom. The case should not be decided on things that happen outside the courtroom, and that is why I move for a mistrial.
>
> COURT: On [behalf] of the State, [prosecutor]?
>
> PROSECUTOR: Your Honor, the State would resist. The State believes that when Ms. Clair left she did walk quickly out of the courtroom, and it is our understanding that she did get ill outside of the courtroom area. I did not see it obviously, but it could be heard from the courtroom, and the jury did leave shortly thereafter.
>
> However, there are certain things the State can't control with witnesses; someone else's illness. If she got ill on the stand, the State doesn't believe that's enough for a mistrial either. We don't believe that this obviously was intentional on anybody's part. She tried to get out of the courtroom so she didn't get ill in the courtroom.

We don't believe that there's prejudice to the defendant that rises to the level of a motion for new trial to be granted, and the State would resist.

. . . .

COURT: Well, in the court's observation I would pick a different adjective than [defense counsel]. I don't think bolting actually applies. She did leave quickly. She was obviously distraught at that point already. It was obvious to the court that the sounds being heard from right outside the courtroom were of someone vomiting, and the jury was essentially right behind Ms. Clair as she left through the same courtroom door.

The fact that a witness is very upset and emotional over testimony which would be upsetting and emotional I think to almost anyone would probably come as no great surprise to the jury. The court does not believe that the events as described rise to the level of denial of a fair trial to the defendant, and accordingly, the motion for mistrial is denied.

The trial then resumed.

Deputy Erik Peterson was the first officer to respond to the scene following Clair's 911 call. He testified Wilson and Clair were both outside the home when he arrived—just a couple minutes after the call—and both were "very distraught and crying." When he entered the home, he located J.K. and found that she was unresponsive, with no pulse or breath sounds. He also noted she was "extremely cold" to the touch and determined she had been deceased too long for reviving methods to have an effect. In looking around the home, the deputy noticed the bathroom floor looked as if it had been cleaned more recently than the other floors in the home, which were "gritty," and a wet mop was still in the bathroom. Additionally, J.K. was wearing underwear saturated with what appeared to be water; the liquid did not have the odor of urine. There was still a couple of inches of water in the bathtub from the previous evening. Another investigating officer noted that only J.K.'s underwear was wet—the rest of her body, including her hair, was dry.

Officers located a "stain" on the outside of the bath tub that they believed could be blood. Similarly, they took samples from a spot on the door handle of the shower doors and a spot on the floor. Two pieces of what appeared to be skin tissue were removed from the water.

Each of the samples from the spots tested positive for the presence of blood, but the criminologist was unable to obtain a DNA profile from any of the samples. He testified that he may not have been able to get a profile because the sample was not large enough or because the blood was diluted by something, such as water. Additionally, the skin tissue was consistent with the known DNA profile of J.K., and the probability of finding that profile in a population of unrelated individuals would be less than 1 out of 940,000.

An investigator from the department of criminal investigations testified that he interviewed Hall in connection with J.K.'s death. When he told Hall they intended to have an autopsy performed on J.K., Hall told him they could not do it because they did not have his permission. Because a parent's permission is not necessary for the State to complete an autopsy, one was performed anyway.

Lastly, the medical examiner, Dr. Dennis Klein, testified. He opined the cause of death was asphyxia by drowning. He "favored" drowning over suffocation or other forms of asphyxia, noting there was liquid in J.K.'s stomach, lungs, and sinuses. Additionally, he relied on the fact that she was found near the bath tub, which had water in it. He noted that it was a homicide rather than accidental drowning because J.K. was not found in the tub. As he stated:

> Well, in accidental drowning, if [J.K.] were left in a bathtub with water and the person [who] was taking care of [J.K.] left and just forgot about it, she would still have been found in the tub.

You're not able to drown, self-rescue, get out of the tub and then succumb. You're going to be found in the water where you drown.

. . . .

Well, obviously as a child gets older, they are more developed and they're able to—if they fall in the water and the face goes under water, the child, an older child, can just pick themselves up and climb out of the tub themselves. An infant, they do not have the development or the strength sometimes to just pick themselves out of the water.

He also testified J.K. had "significant internal injuries" at the time of her death, noting she had "blunt force injuries causing deep hemorrhaging to the fatty tissues" in the areas of her mid-back, buttocks, and the back of her right knee. He noted the "thermal injury" to the side of her face, which he believed was weeks—as opposed to days—old. The prosecutor asked, "And if it's not treated in any way, can that lead to any type of scar?" Dr. Klein responded, "It can lead to scarring and sometimes infection."

Following the testimony of Dr. Klein, the State, and then Hall, rested.

The jury found Hall guilty as charged.

The court sentenced Hall to life in prison without the possibility of parole for his conviction of murder in the first degree and a term not to exceed ten years for his conviction of child endangerment causing serious injury. The court ordered the two sentences to be served concurrently.

Hall appeals.

## II. Standards of Review.

We review the district court's refusal to grant a mistrial for an abuse of discretion. *State v. Newell*, 710 N.W.2d 6, 32 (Iowa 2006).

We review the sufficiency of the evidence for correction of errors at law. *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012). In doing so, we "consider all

of the record evidence viewed 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *Id.* (citation omitted).

## III. Discussion.

### A. Motion for Mistrial.

Hall maintains he was entitled to a mistrial "due to the prejudice created when the State's primary witness Clair ran from the witness stand and vomited in front of the jury." "A mistrial is appropriate when 'an impartial verdict cannot be reached' or the verdict 'would have been reversed on appeal due to an obvious procedural error in the trial.'" *Newell*, 710 N.W.2d at 32 (citation omitted). "The pertinent question here is whether the trial court was clearly unreasonable in concluding an impartial verdict could be reached . . . ." *Id.*

First, it is not clear to us Clair's involuntary and unexpected action was prejudicial to Hall. Clair was ill after hearing her 911 call; the call indicated Clair had found J.K. unresponsive, but it did not speak to who or what may have caused that unresponsiveness. Insofar as the action may have made the testimony or evidence directly preceding it stand out in the jury's mind, we do not believe emphasis on the undisputed facts that Clair found J.K. and called 911 prejudiced Hall. Additionally, while Hall maintains the response may have made the jury more sympathetic to Clair, we are unsure what such sympathy would garner. Clair is not the mother of J.K., and—based on her own testimony—she allowed J.K. to be harmed in her home for approximately six weeks without intervening or seeking medical care—a fact that resulted in Clair also being charged with child endangerment causing serious injury. *Cf. State v. Rodriguez,*

636 N.W.2d 234, 243 (Iowa 2001) (stating evidence is unfairly prejudicial when it has the capability of making the jury desire to punish the defendant). Moreover, while Clair was the only other adult around J.K. near the time of her death on the morning of May 22, Hall never tried to direct blame at her; instead, Hall's counsel spent his closing argument attempting to discredit the opinion of the medical examiner both as to cause of J.K.'s death—asphyxiation—and the means—homicide. Thus, we are not concerned sympathy for Clair prevented the jury from considering her as the responsible party. As the district court said, "The fact that a witness is very upset and emotional over testimony which would be upsetting and emotional I think to almost anyone would probably come as no great surprise to the jury."

Although we doubt whether Hall suffered prejudice as a result of Clair being sick in the hallway, we consider whether the district court abused its discretion in denying Hall's motion for mistrial. In *Newell*, 710 N.W.2d at 32–33 in determining whether the admission of evidence of a prior bad act warranted a mistrial, our supreme court considered the following: whether the admission of the prejudicial evidence was isolated or pervasive, whether the jury was admonished not to consider the improper evidence, and the relative strength of the evidence against the defendant. We do the same here.

Here, the act was isolated. After the recess, Clair took the stand again and finished her testimony without incident. Defense counsel did not request a curative instruction, but counsel could have made a strategic decision not to place more emphasis on the moment. *See, e.g., State v. Huser*, ___ N.W.2d ___, ___, 2017 WL 1788065, at *20 (Iowa 2017) (citing *Jones v. State*, 128 So.

3d 199, 200 (Fla. Dist. Ct. App. 2013) (noting counsel's strategic decision to decline a curative instruction because such an instruction would be "like putting the fire out with gasoline")). And finally, the evidence against Hall was strong. The medical examiner opined that J.K.'s cause of death was asphyxiation by drowning, and Hall was the only person home with J.K. at the time of her death. The evidence was less strong for the charge of child endangerment causing serious bodily injury—as will be seen below—but even defense counsel conceded in his closing remarks that if you believed the testimony of Clair and one of her children, who both testified the injuries found on J.K. were a result of Hall hitting her with a piece of wood, Hall was guilty of at least the lesser-included offense of child endangerment causing bodily injury.

For all of the foregoing reasons, we cannot say the district court abused its discretion in denying Hall's motion for mistrial.

**B. Child Endangerment Causing Serious Injury.**

Hall maintains there is insufficient evidence to support his conviction for child endangerment causing serious injury. The charge related to Hall's alleged actions during the two-week period before J.K.'s death, including the hot water burn and the blunt force trauma. The State focused at trial and on appeal on the hot water burn as serious injury. To convict Hall of the charge, the State had the burden to establish the following:

> 1. On the 7th through the 21st of May, 2015, the Defendant was a person having custody or control of [J.K.].
> 2. [J.K.] was under the age of 14 years.
> 3. The Defendant knowingly acted in a manner which created a substantial risk to the physical, mental, or emotional health or safety to [J.K.].
> 4. The Defendant's acts resulted in serious injury to [J.K.].

Here, Hall challenges only the evidence supporting the fourth element, specifically whether J.K. suffered serious injury.

"'Serious injury' has a technical meaning." *State v. McKee*, 312 N.W.2d 907, 912 (Iowa 1981). Pursuant to Iowa Code section 702.18 (2015):

> 1. "Serious injury" means any of the following:
> . . . .
> b. Bodily injury which does any of the following:
> (1) Creates a substantial risk of death.
> (2) Causes serious permanent disfigurement.
> (3) Causes protracted loss or impairment of the function of any bodily member or organ.
> c. Any injury to a child that requires surgical repair and necessitates the administration of general anesthesia.
> 2. "Serious injury" includes but is not limited to skull fractures, rib fractures, and metaphysical fractures of the long bones of children under the age of four years.

We note that "serious permanent disfigurement" is not defined by the statute; "scarring may in some circumstances rise to the level of serious permanent disfigurement." *State v. Hanes*, 790 N.W.2d 545, 554 (Iowa 2010). Because scarring is not a per se serious disfigurement, it is up to the jury to determine whether a specific scar fulfills the element. *Id.*

Here, the record does not indicate that J.K. had any scars at the time of her death. Rather, the prosecutor asked the medical examiner if the injuries J.K. sustained from hot water on her face *could lead* to scarring, and the doctor agreed the thermal injury "can lead to scarring and sometimes infection." As we stated above, scarring is not always a permanent disfigurement. Thus, we cannot say that a wound that may have scarred in the future, given time, is sufficient to find a permanent disfigurement. There is not sufficient evidence to support a finding of "serious injury" based on the burn wounds.

Because there is insufficient evidence to support Hall's conviction of child endangerment resulting in serious injury, we reverse his conviction on that count. However, we conclude there is sufficient evidence to find Hall guilty of the lesser-included offense of child endangerment causing bodily injury. *See* Iowa Code § 726.6(6). The jury was given the option of convicting Hall of the charge, but it "did not reach a verdict on that offense because it found that the State had established all elements on a greater offense. In so doing, the jury necessarily found that the State had established all elements of the included offense." *State v. Morris*, 787 N.W.2d 787, 788 (Iowa 2004). Thus, we remand for the district court to enter an amended judgment of conviction with respect to child endangerment causing bodily injury; Hall shall then be resentenced according to law.[3] *Id.*

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

[3] Hall has also made a third claim—that trial counsel was ineffective for failing to request a jury instruction clarifying what had to be "knowing" within the child endangerment instruction. Insofar as his claim applies to his new conviction for child endangerment causing bodily injury, we preserve it for further development of the record in future postconviction-relief proceedings. *See State v. Johnson*, 784 N.W.2d 192, 198 (Iowa 2010) (stating it is for the court to determine whether an ineffective-assistance claim can be decided on direct appeal, and if it cannot, the claim must be preserved, "regardless of the court's view of the potential viability of the claim").