# IN THE COURT OF APPEALS OF IOWA

No. 17-0133
Filed March 21, 2018

**STATE OF IOWA,**
　　　　Plaintiff-Appellee,

**vs.**

**DOMINIC WAYNE POGWIZD II,**
　　　　Defendant-Appellant.
_____

Appeal from the Iowa District Court for Boone County, Paul G. Crawford, District Associate Judge.

The defendant appeals his conviction for assault. **AFFIRMED.**

Andrew J. Boettger of Hastings, Gartin & Boettger, L.L.P., Ames, for appellant.

Thomas J. Miller, Attorney General, and Thomas E. Bakke, Assistant Attorney General, for appellee.

Considered by Potterfield, P.J., Mullins, J., and Blane, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2018).

**POTTERFIELD, Presiding Judge.**

Dominic Pogwizd II appeals from his conviction for assault, a simple misdemeanor.[1] Pogwizd maintains the district court erred by admitting into evidence statements of the alleged victim through the testimony of third-party witnesses in violation of the Confrontation Clause and rules prohibiting the admission of hearsay.

## I. Background Facts and Proceedings.

On August 10, 2016, Pogwizd was arrested and charged with domestic abuse assault with intent to inflict serious injury (involving his girlfriend). Pogwizd entered a plea of not guilty

Before the trial began in December, the State informed the court that it did not anticipate the girlfriend would be testifying and filed a document it titled "Statements," in which it asked the court "to make a pretrial ruling on the admissibility of statements made by the [girlfriend] in this case." The statements were separated into four categories based on when and how the statements were made to a third party: statements made to school nurse MaryAnn Moklestad before the police arrived; statements made to police detective John Mayse before the ambulance arrived; statements made at the hospital to Dr. Kathryn Howe; and statements made to Detective Mayse a number of hours later at the police station.

On the record, immediately before the start of trial, the court, prosecutor, and defense counsel went through each category of statements. The prosecutor argued why the State believed the statements were admissible through the third

---

[1] Pogwizd filed an application for discretionary review, which our supreme court granted. *See* Iowa Code § 814.6(2)(d) (2016).

party witnesses, and Pogwizd resisted each based on "hearsay and a violation of [Pogwizd's] right to confrontation."

The court made a number of preliminary rulings, indicating that certain statements made to the school nurse, the detective before the ambulance arrived, and the doctor may be admissible as exceptions to the hearsay rule if the State was able to provide a proper foundation. The court ruled to exclude the girlfriend's statements to the detective made at the police station a number of hours after the incident. The court did not rule on Pogwizd's Confrontation Clause objection.

During trial, Pogwizd objected a number of times during the State's direct examination of school nurse, Detective Mayse, and Dr. Howe. Each time, Pogwizd stated the objection was for hearsay purposes and the court overruled the objection.[2]

The jury convicted Pogwizd of the lesser-included crime of assault. He was later sentenced to four days in jail.

Pogwizd appeals.

## II. Discussion.

### A. Error Preservation.

The State maintains that Pogwizd has failed to preserve error on his claim that evidence was admitted in violation of the Confrontation Clause. We agree.

"It is generally recognized that a motion in limine does not preserve error since error does not occur until the matter is presented at trial." *State v. Delaney*, 526 N.W.2d 170, 177 (Iowa Ct. App. 1994). "An objection should be made at trial

---

[2] Pogwizd also objected based on relevancy and whether the evidence violated the rule against prior-bad-acts evidence, but those rulings have not been challenged on appeal.

to preserve error." *Id.* While there is an exception to this general rule "if the prior ruling on the motion in limine 'amounts to an unequivocal holding concerning the issues raised,'" such was not the case here. *Id.* (citation omitted). Even the rulings the court did make—involving Pogwizd's hearsay objections—were contingent, stating that if the State met certain requirements in front of the jury, the court believed some evidence would be admissible. The court did not rule on Pogwizd's Confrontation Clause claim. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("[I]ssues must be both raised and decided by the district court before we will decide them on appeal."). Moreover, Pogwizd appeared to understand the need to object during trial, as he objected on the basis of hearsay several times during trial—all during testimony the court had made preliminary rulings on.

Because Pogwizd has failed to preserve error on his Confrontation Clause claims, we do not consider them further. *See State v. Tangie*, 616 N.W.2d 564, 569 (Iowa 2000) ("[T]he court made it clear it would not rule on the hearsay objection until the evidence was offered at trial, and it gave no indication at all how it would rule on a Confrontation Clause argument had the argument been presented to it. We conclude the defendant has failed to preserve a Confrontation Clause argument and has therefore waived it.").

### B. Hearsay.

Pogwizd challenges the district court's rulings on his hearsay objections, which allowed the school nurse and police detective to testify as to statements made to them by the girlfriend based on the excited-utterance exception, *see* Iowa

R. Evid. 5.803(2), and allowed Dr. Howe to testify as to the statements based on the medical-diagnosis exception, *see* Iowa R. Evid. 5.803(4).

"Hearsay 'is a statement, other than one made by the declarant while testifying at . . . trial, . . . offered in evidence to prove the truth of the matter asserted.'" *State v. Newell*, 710 N.W.2d 6, 18 (Iowa 2006) (citation omitted). Such statements "must be excluded as evidence at trial unless admitted as an exception or exclusion under the hearsay rule or some other provision." *Id.* (citation omitted). We review rulings on the admissibility of hearsay evidence for correction of errors at law. *State v. Thompson*, 836 N.W.2d 470, 476 (Iowa 2013). Here, we consider each grouping of statements that were objected to in turn.

*Statements Made to School Nurse.* During the State's direct examination of the school nurse, the following exchange took place:

> Q. And on August 10, 2016, were you working at Page Elementary School? A. Yes, I was there doing paperwork getting things ready for the 2016/17 school year.
> Q. And school wasn't in session at this time, was it? A. It was not in session. It was really my first day back with the secretary.
> . . . .
> Q. [D]id anything unusual happen while you were working? A. Yes, that morning the secretary called me to come up to the front desk.
> Q. And what did you see when you came up to the front desk? A. At that time there was a young lady that was there. She was crying, shaking, trembling, just was very scared.
> Q. And that's, what, your opinion of how you observed her? A. Yes, yes.
> Q. Did you notice anything else about her? A. Um, well, that her hair was wet. Just that she was just shaking and very scared and since she was crying and just really out of control with fear it looked like, I took her back to my little cot where I have the children lay down during the school day and I just had her sit there and that's where I talked to her more.
> Q. Okay. And what happened next? A. Then I asked her, you know, what's going on because she kept crying. I was trying to calm

her down, talk to her, get to know her, because I did not know her and that's when she said her boyfriend tried to—

DEFENSE COUNSEL: Objection, hearsay.

THE COURT: Overruled for reasons cited previously.

Q. What did she tell you? A. That's when she told me her boyfriend tried to drown her.

Q. And did she say anything else to you? A. Just that she was so scared. She was scared to go back to the house. She was very worried about her belongings at the house. She really wanted to get back there and get things out of the house, but she was very scared and just shaking and crying.

Q. And what she told you was consistent with what you saw her visibly? A. Yes.

Q. So she was visibly scared? A. Yes, she was visibly scared.

Q. And she said she was afraid to go back to her apartment? A. She was afraid to go back.

DEFENSE COUNSEL: Objection, hearsay.

THE COURT: Overruled.

Q. You said she was afraid to go back to her apartment? A. She was afraid to go back.

Q. And that her boyfriend tried to drown her? A. Yes, that her—yeah, she was very scared to go back in case her boyfriend was there, but she had told me that her boyfriend had tried to drown her, yes.

Q. And what happened next? A. I called for the secretary to call the police, call 911.

Q. And did anyone arrive from the police department? A. Yes.

Q. Okay. And how soon after she went to your office and you sat her in the back did the police arrive? A. Probably five minutes.

. . . .

Q. During this time are the doors of the school locked, typically? A. Our doors are always locked. I did tell her that she was safe at our school because our doors are locked. The only way you can get in is by pressing a button and a doorbell will ring.

Q. And did she mention anything about trying to get into the school? A. She was trying to get into—

DEFENSE COUNSEL: Objection, hearsay.

THE COURT: Can you lay further foundation, [prosecutor]?

Q. When she is in the back near your cot and while she was visibly shaking and scared, during that time did she say anything about trying to get into the school? A. Yeah. She was trying to get into the school, but she was also trying to get into other homes to find a place to be safe.

Q. And that's what she told you? A. That she was trying to be safe.

The district court allowed the school nurse to testify about the girlfriend's statements because it determined they were admissible as excited utterances. *See* Iowa R. Evid. 5.801(2) ("A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused.").

> The application of the exclusion lies largely within the discretion of the trial court, which should consider (1) the time lapse between the event and the statement, (2) the extent to which questioning elicited the statements that otherwise would not have been volunteered, (3) the age and condition of the declarant, (4) the characteristics of the event being described, and (5) the subject matter of the statement.

*State v. Atwood*, 602 N.W.2d 775, 782 (Iowa 1999).

Here, the time lapse between the assault and the statements was not long. The girlfriend had escaped from the residence and then traveled on foot approximately one block in an attempt to find help. Although the exact amount of time that had lapsed is not clear from the record, it appears it was a matter of minutes. *Cf. Atwood*, 602 N.W.2d at 782 (upholding a statement as an excited utterance made "at most two and one-half hours" after the event); *State v. Mateer*, 383 N.W.2d 533, 535 (Iowa 1986) (made more than an hour after the event); *State v. Stafford*, 23 N.W.2d 832, 835–36 (Iowa 1946) (made fourteen hours later). Although the school nurse testified that she asked the girlfriend a general question about what had happened, "the fact that a statement was prompted by a question does not automatically disqualify it as an excited utterance." *State v. Harper*, 770 N.W.2d 316, 320 (Iowa 2009). Additionally, the school nurse testified she asked the question because the girlfriend "kept crying" and the nurse was "trying to calm her down, talk to her, get to know her, because I did not know her." The school nurse described that the girlfriend was "crying, shaking, trembling, just was very

scared" and "just really out of control with fear." Moreover, the girlfriend's hair was still wet, and she described that Pogwizd had tried to drown her. Her condition at the time of the statements supports the court's determination the statements were excited utterances. *See State v. Watts*, 441 N.W.2d 395, 398 (Iowa Ct. App. 1989). The subject matter of the girlfriend's statements was "clearly probative," explaining why her hair was wet, why she ran to the school, and why she was visibly upset. *See Atwood*, 602 N.W.2d at 782.

The circumstances surrounding the girlfriend's statements supported the district court's determination the excited-utterance exception applied to the statements made to the school nurse.

*Statements Made to Police Detective.* Similarly, the district court allowed the police detective to testify as to statements made by the girlfriend because it found they were exited utterances. During the State's direct examination of the detective, the following took place:

> Q. Do you recall approximately what time you received that dispatch? A. It was approximately 9:40 in the morning.
> . . . .
> Q. And how long did it take you to get to Page School when you heard the dispatch? A. Three, four minutes.
> . . . .
> Q. And how did [the girlfriend] appear to you when you saw her with nurse Moklestad? A. [The girlfriend] was very upset. She was crying. Her hair was wet. She had a little bit of blood on her shirt. She was very distraught. Like I said, in and out of like crying, weeping to [the nurse], said she was in some pain. Asked her what pain she had. She had a little bit of a cut on her lip. She complained of some neck and back pain. At that time I called for an ambulance to come and check her out, so that was my initial contact.
> Q. Okay. And while you're speaking with her in that back room, you said you—based on what she told you, you called paramedics? A. Yes, I did.
> Q. And did she tell you anything else in that back room before paramedics arrived?

> DEFENSE COUNSEL: Objection.  Calls for hearsay.
> THE COURT: Overruled. You can answer.
> A. Yes.  When I was waiting for the paramedics to arrive I asked her what had transpired, what had happened.  She stated that her boyfriend and her had gotten into some kind of an argument and she had stated that he was very upset.  She stated that he was very upset that she didn't want to go to work with him that morning and she didn't know why he was so upset but he was, that he grabbed her by the head and pushed her head into the wall.  She said he had hit her a few times with an open hand and then she said he had drug her into the bathroom and pushed her head into the tub with water and tried to drown her.  Like I said, she was weeping and crying.  She was very upset.  So she's telling me this in between, you know, crying at the same time.  She also made the same statement when the paramedics arrived to them when they asked her what had happened to her.

Here, the analysis is very similar to that regarding the girlfriend's statements to the school nurse.  The statements were made only a few minutes after the initial statements and the girlfriend was still "very upset," "crying," and "very distraught."  The officer asked a general question about "what had transpired," and the girlfriend responded with a probative response.

For the same reasons as stated above, we cannot find the district court erred in determining the statements to the officer were excited utterances.  *See id.* at 783 (applying the same test when the statements were made in response to a question by a police officer).

*Statements Made to Doctor.*  Pogwizd objected a number of times during the State's examination of Dr. Howe.  The court overruled each of the hearsay objections, finding that the statements were admissible as the medical diagnosis exception.  *See* Iowa R. Evid. 5.803(4) (providing a statement that is "made for— and is reasonably pertinent to—medical diagnosis or treatment" and "[d]escribes medical history, past or present symptoms or sensations, or the inception or

general cause of symptoms or sensations" is admissible as an exception to the rule against hearsay).

The girlfriend was taken by ambulance from the school to the emergency room, where she was seen by Dr. Howe. During direct examination by the State, Dr. Howe testified as follows:

> Q. And as part of your examination when you see a patient— you mentioned there is different types of injuries as far as aggressive injuries and defensive injuries. Do you look at a patient for these things? A. Yes.
>
> Q. Okay. Especially the way she was admitted are you looking at these things? A. Yeah. If you're coming in with an assault, then we look for signs of injury, and part of that is looking for what you think looks like a mechanism of injury and essentially that means like does what they say like happened kind of match up with their injury.
>
> Q. Okay. And so do you ask questions? A. Yeah.
>
> Q. And why do you ask questions? A. You ask the questions to see what happened so you can fix it.
>
> Q. And is that a standard practice? A. Yes.
>
> Q. And is . . . that reasonably relied upon by medical professionals to ask questions of the patient of the mechanism of injury? A. Yes.
>
> Q. Why do you do that? A. So we know how someone was injured.
>
> Q. Why don't you just try to derive it by looking at them without even talking to them? A. Because how someone is injured can sometimes tell you how it's best to fix it. So you can order the right tests to evaluate it in the proper way.
>
> . . . .
>
> Q. And did you ask these types of questions to [the girlfriend] at the hospital? A. I did.
>
> Q. And did these questions help in your diagnosis? A. Yes.
>
> Q. And what did you ask [the girlfriend]? A. I asked her about what had happened and if she had any injuries.
>
> Q. And what did she say had happened?
>
> DEFENSE COUNSEL: Objection, hearsay.
>
> THE COURT: Overruled.
>
> A. She said she had been assaulted.
>
> Q. Do you ask like who assaulted her or do you— A. She said it was her boyfriend.

Q. Why do you ask that question like who assaulted?  A. Part of it is to see if she feels safe because that's the other thing that we try to determine in the emergency room is if people are safe.

Q. Okay.  Does that help in kind of reaching if people answering your questions if they feel safe in the emergency room?  A. Yeah.  There's times that we need to call the police to make sure someone is safe so they can go home.

Q. And just like any other diagnosis, you don't want them to be placed back in the environment?  A. Yes.

. . . .

Q. Does she say what physically happened to her the night before?  A. Yeah.  Is it okay if I look at my notes?

. . . .

DEFENSE COUNSEL: Objection, relevance.  403.  Hearsay.

THE COURT: Hearsay overruled for reasons already established on the record outside of the jury.

. . . .

Q. What did she tell you happened the night before?

DEFENSE COUNSEL: Same objections, Your Honor.

THE COURT: Okay. The Court is going to overrule on hearsay.  I think it does talk about excited utterance circumstances as well as the medical, statements of medical condition testimony.

. . . .

Q. What did she tell you?  A. The night before he had thrown her down and struck her head against a door several times.

Q.: And did she tell you what happened that morning between her and Dominic?  A. They got in another fight.

. . . .

Q. And what did she say had happened?  A. At that time she told me that he had thrown her against the floor, drug her by her hair, hit her head against the floor and held her head under water in the bathtub.

Q. And does she say anything about being fearful of him?  A. She was afraid for her life.

DEFENSE COUNSEL: Objection, hearsay.  Move to strike.

THE COURT: Overruled for both excited utterance and medical condition testimony. . . .

Q. And did she say anything about what she felt was going to happen to her that morning by being dragged and placed in the bathtub?  A. She thought he was attempting to drown her.

Q. And in your report you mention that she stated "I was scared he was going to kill me this time."

DEFENSE COUNSEL: Objection.  Leading, hearsay.

THE COURT: Leading part is sustained.

Q. Did she say anything about being in fear of whether or not he was going to kill her this time?  A. Yeah.  Her exact words as I put

in my note were quote I was scared he was going to kill me this time end quote.

"The rationale for the [medical-diagnosis] exception is that statements made by a patient to a doctor for the purposes of medical diagnosis or treatment are 'likely to be reliable because the patient has a selfish motive to be truthful.'" *State v. Smith*, 876 N.W.2d 180, 185 (Iowa 2016) (citation omitted). Thus, the question is whether each of the statements admitted into evidence over Pogwizd's objection was admissible for another reason or was "reasonably pertinent to diagnosis or treatment." *Id.*

Following Pogwizd's objections, Dr. Howe was allowed to testify as to statements made by the girlfriend that "she had been assaulted"; "he[3] had thrown her down and struck her head against a door several times"; "she thought he was attempting to drown her"; and she had thought "he was going to kill [her] this time."

We believe the first three statements fall within the medical-diagnosis exception, as they provided the treating physician with the mechanisms of injury the girlfriend complained of and provided insight into injuries she may have sustained that were less immediately apparent, such as to her lungs or skull. The girlfriend's statement regarding her belief Pogwizd intended to kill her "this time"[4]

---

[3] In *Smith*, our supreme court considered whether a statement identifying the perpetrator of the physical injury was necessary information for effective medical treatment. 876 N.W.2d at 186. The court declined to create a categorical rule allowing the admission of such statements under the medical-diagnosis exception. *Id.* at 188. Instead, the trial court must make a case-by-case determination depending on the foundation laid by the medical personnel. *Id.* However, we need not determine if such an identification would meet the test here, as Pogwizd did not object to the doctor's testimony that the girlfriend identified "her boyfriend" as the assailant.

[4] Pogwizd did not object at pre-trial, trial, or on appeal that the question about the fight the night before this event or the statement he was going to kill her "this time" suggested prior bad acts.

provided scant insight for either diagnosis or treatment. However, even if this final statement does not fall within the medical-diagnosis exception, it is admissible as an excited utterance.

The girlfriend was taken from the school to the hospital by ambulance, where she was seen by Dr. Howe in the emergency room. Dr. Howe testified that when she saw her, the girlfriend was "anxious," "tearful," and "upset." The doctor asked what happened and if the girlfriend had sustained any injuries, and the girlfriend responded with the statement that Pogwizd had attempted to drown her and she "was scared he was going to kill [her] this time." Because the amount of time between the assault and the statement was not long—within an hour,[5] the questions by Dr. Howe were general in nature, the girlfriend was still "under the stress of excitement that" the assault caused, and the statements were probative, the girlfriend's statement that she believed Pogwizd "was going to kill [her] this time" was admissible as an excited utterance.

**III. Conclusion.**

Because each of the claims Pogwizd complains of were properly admitted pursuant to an exception to the hearsay rule and his claim regarding the Confrontation Clause was not preserved for our review, we affirm.

**AFFIRMED.**

---

[5] Dr. Howe testified the girlfriend was admitted at 9:41 a.m.; Detective Mayse testified was originally dispatched to the school at "approximately 9:40 in the morning."