# IN THE COURT OF APPEALS OF IOWA

No. 21-1737
Filed January 25, 2023

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**BENJAMIN BRAVO GONZALEZ,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Cerro Gordo County, DeDra Schroeder, Judge.

The defendant appeals from his conviction for first-degree murder, arguing his motion for mistrial should have been granted. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Heard by Greer, P.J., Chicchelly, J., and Gamble, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**GREER, Presiding Judge.**

Was it improper to deny a motion for new trial once an officer testified at trial to another pending crime of assault unrelated to the crime involved here? Under these facts, we say no.

With this question at the forefront, Benjamin Gonzalez appeals his conviction for first-degree murder. He argues the district court abused its discretion in denying his motion for mistrial after a police officer testified that an eyewitness was interviewed a second time "after . . . she was assaulted." Gonzalez urges us to conclude the jury assumed the assault was "a retaliatory act for talking to police" and was used as evidence of Gonzalez's guilt in the shooting for which he was on trial; he maintains this deprived him of a fair trial.

**I. Background Facts and Proceedings.**

At Gonzalez's multiple day jury trial, three separate eyewitnesses testified they were present when Gonzalez shot and killed Michael Creviston. Sara dated Creviston off and on for years; she testified she was walking with Creviston when the car Gonzalez was riding in pulled up. Sara immediately recognized Gonzalez, whom she knew as a friend of her brother. Creviston and Gonzalez exchanged angry words before Sara convinced Gonzalez to walk away. As they were leaving on foot, Sara heard Gonzalez say, "I got something for you, pussy." Sara and Creviston both turned around, and Gonzalez was standing outside the car with his arm straight out in front of him; Sara saw "a red flash, and it smelled like fireworks after that." Creviston reacted like he'd been hit, and he told Sara to call 911 because he could not breathe. At that point, Gonzalez got back in the car and left. Police responded within just a few minutes, and Sara immediately identified

"Benja"—Gonzalez's nickname—as the shooter. Creviston was struck by one bullet, which hit his left lung and pulmonary artery; he died from the wound.[1]

Meredith testified she met Gonzalez only a day or two before the March 31, 2021 shooting. She was sitting in the backseat of the car getting a ride home when Gonzalez, from the front passenger seat, told the driver to slow down near two people who were walking. Meredith saw Gonzalez scuffle with the male walker while Gonzalez still in the car before both Gonzalez and the two walkers moved toward the back of the car. Meredith did not look back, but she heard "pop, pop, pop" before Gonzalez got back in the car. As they drove away, Gonzalez laughed and said, "Look at him now." When she got near her home, Meredith wanted to exit the vehicle, but Gonzalez initially tried to stop her, telling her, "Nope. You're going with us. The only reason you want out is so you can tell on me." She left anyway. She did not immediately call the police and when asked why she did not, Meredith testified, "I was raised we don't call police." But when the police picked her up on April 5 and interviewed her at the police station, she provided a written statement identifying Gonzalez as the shooter.

Ashton testified that, prior to the day of the shooting, she had only known Gonzalez a couple of weeks. On that night, Ashton, Meredith, and Gonzalez left from Ashton's apartment to take Meredith home when—with Ashton driving—they came upon the two walkers. Ashton testified Gonzalez asked her to pull over so she did. As the male walker approached, Ashton realized it was Creviston, who she also knew. Creviston and Gonzalez exchanged angry words and began

---

[1] The medical examiner who performed the autopsy provided this testimony.

physically fighting. Then Creviston started walking away, and Gonzalez got out of the car and walked in the same direction. Ashton heard four gunshots,[2] and she started to get out of the vehicle to help. Gonzalez returned, pulled her back in the vehicle, and told her to drive. She did, first taking Meredith home and then, at Gonzalez's direction, driving to the river, where she saw Gonzalez make a throwing motion (though she couldn't tell what, if anything, he threw). Ashton returned to her apartment but was later picked up and taken to a hotel in a nearby town, where she used her name and identification to rent a room for Gonzalez. The next day, Gonzalez asked Ashton to find him someplace else to go, and two of her friends picked up Gonzalez and allowed him to stay with them in a different town. Ashton was first interviewed by police on April 2; she did not tell them about the shooting "[b]ecause [she] was told not to." She was interviewed again on April 5, and she reported Gonzalez was the shooter and told them where to find him at her friends' home. Gonzalez was taken into police custody that same day.

Investigator Terrance Prochaska works for the local police department; he was the State's tenth witness. During cross-examination, the following exchange took place between Gonzalez's attorney and Investigator Prochaska:

> Q. Officer Prochaska, [Ashton] was interviewed twice; is that correct? A. Yes.
> Q. The statements were not the same from both interviews; is that correct? A. I didn't interview her the first time, so I'm not fully aware of what she stated.
> Q. Did you bring up the first interview when you spoke to her on the 5th? A. I may have. You'd have to show me that.
> . . . .

---

[2] Sara and Meredith testified there were three shots, while Ashton testified as to four. The police recovered four 9 mm cartridges, and a criminalist from the Iowa Division of Criminal Investigation opined they were probably all fired from the same firearm.

Q. Officer Prochaska, you interviewed [Meredith] twice; is that correct?  A. I interviewed her once.  You have to refresh me if I interviewed her a second time.  I—we—there was some—there was a follow-up interview after—after we were made aware that she was assaulted.  Is that what you're referring to?

Defense counsel immediately requested a recess and, outside the presence of the jury, moved for mistrial, arguing "a prior bad act allegation" was "brought in" and asserting the jury was tainted by the officer's statement.  The court noted "the jury doesn't know that [Meredith] has been potentially harmed by [Gonzalez]" and asked counsel if there was "a way to fix this to let the jury know that the assault interview is wholly unrelated to this case."  Defense counsel responded that Ashton's testimony she "didn't say anything on the 2nd because [she] was told not to" make statements and "then that discussion of a subsequent assault of Meredith . . . after talking to law enforcement, could be seen as retaliation that is unsubstantiated and unrelated to this matter."  The prosecutor explained the assault that the officer referenced took place after Gonzalez was already in jail; he stated, "Yeah, it's not connected to [Gonzalez].  [Meredith]—she reported an assault, is my understanding.  We had no idea it was—he was in jail, so we knew it wasn't him.  And she didn't want to press charges.  That's all I was told."  The State resisted the motion for mistrial, arguing any issue could be cleared up by giving the investigator a chance to testify in front of the jury that the referenced assault was not connected to Gonzalez or the murder case.  Gonzalez responded that "clean[ing] it up" would not help because "it's going to be prevalent in the jury's mind"; "[T]his has tainted the jury to the point we cannot get rendered a fair verdict."

The court denied Gonzalez's motion, ruling the jury would be brought back in, the court reporter would read the question back, and the investigator would be given the chance to make clear the assault of Meredith had "nothing to do with this case, nothing to do with this defendant, wholly unrelated matter, and then we move forward." In the presence of the jury, the question was read back and the investigator testified, "I remember one time interviewing her and a second time on an unrelated case."

After the investigator, five more witnesses testified for the State before it rested. And then Gonzalez rested without presenting a defense. The jury returned a guilty verdict, which the district court accepted. Gonzalez appeals.

## II. Discussion.

We review the district court's denial of a motion for mistrial for an abuse of discretion. *State v. Newell*, 710 N.W.2d 6, 32 (Iowa 2006). "A mistrial is appropriate when 'an impartial verdict cannot be reached' or the verdict 'would have to be reversed on appeal due to an obvious procedural error in the trial.'" *Id.* (citations omitted). "The pertinent question here is whether the trial court was clearly unreasonable in concluding an impartial verdict could be reached notwithstanding the [officer's testimony that an eyewitness was assaulted]." *Id.*

Here on appeal, Gonzalez's claim the court should have declared a mistrial is premised on the assumption the jury linked the assault of Meredith—as referenced by the investigator—to "a retaliatory act for talking to police." Gonzalez raised this concern with the district court, which decided that ensuring the jury was explicitly told there was no connection between the assault and Gonzalez's case could "clear up the mess." We cannot say that decision was clearly unreasonable.

*See id.* The district court gave Gonzalez a green light to explain, through his cross-examination, that the assault was unrelated to the claims involving Gonzalez's jury trial. He now complains that the "explanation" to the jury was inadequate. At oral argument before this court, the State agreed that more could have been done, stating:

> In [some] cases, it makes sense to say I can't explore the issue any further without drawing the jury, or drawing the attention to the fact that he, the client, was incarcerated—drawing attention to the fact that is allegedly prejudicial. Here, the difference is that elaborating and clarifying dispels the hint of prejudice.

But, as the State also recognized, it was Gonzalez who made a strategic decision not to follow up on this with Investigator Prochaska after he testified, "I remember one time interviewing her and a second time on an unrelated case." Gonzalez was the one questioning the investigator at the time of the objectionable statement and, based on the court's ruling on the motion for mistrial, Gonzalez would have been well within bounds to ask additional questions of Investigator Prochaska to get closer to the desired statement that the assault had "nothing to do with this case, nothing to do with this defendant, wholly unrelated matter." That Gonzalez may not have received the full remedy the court offered—when Gonzalez was the one in the driver's seat—does not impact our review of whether the court's denial of the motion for mistrial was an abuse of discretion.[3]

In reviewing the court's ruling on the motion for mistrial, as always, we start with the premise that the district court is in the best seat to gauge the effect of the

---

[3] We appreciate there may be strategic reasons for not wanting to go deeper with questions when extraneous information is mentioned in front of the jury, but we find none here where the district court offered a reasonable correction to the record.

challenged testimony on the jury. *See State v. Hunt*, 801 N.W.2d 366, 373 (Iowa Ct. App. 2011) ("A trial court has broad discretion in ruling on a motion for mistrial. This is because the trial court is in a better position than this court 'to gauge the effect of the matter on the jury.'" (citations omitted)). The complained-of testimony here was a single, isolated reference, which was made by the tenth of the State's fifteen witnesses. *See State v. Anderson*, 448 N.W.2d 32, 34 (Iowa 1989) ("It is of significance that the incident was isolated."); *see also Newell*, 710 N.W.2d at 32 (affirming a district court's denial of the motion for mistrial when "[t]he reference to drug charges occurred only once, and there were no questions that elaborated on this information"); *State v. Lopez-Aguilar*, No. 17-0914, 2018 WL 3913672, at *4 (Iowa Ct. App. Aug. 15, 2018) (stating "[t]he challenged evidence was insignificant given the length of the trial and the scope of the evidence," when the trial had twenty witnesses and lasted five days). We find no abuse of discretion by the district court in denying the motion for mistrial.

And, to further support the jury verdict and lack of prejudice to Gonzalez, the evidence of Gonzalez's guilt was exceedingly strong. *See Newell*, 710 N.W.2d at 33 (considering strength of evidence against defendant when determining of mistrial was warranted). All three eyewitnesses who were present testified Gonzalez fought with and then shot Creviston. Within minutes of the shooting, Sara told officers Gonzalez was the shooter. Ashton and Meredith named Gonzalez as the shooter a few days later. And, at trial, there was no evidence to suggest anyone else could have been the shooter. With Ashton's help, Gonzalez left town within a few hours of the shooting, staying in a hotel room booked under Ashton's name rather than his own and then, one day later, traveling to a different

town to stay with Ashton's friends. When police finally located and approached Gonzalez on April 5, he fled. *See State v. Wilson*, 878 N.W.2d 203, 212 (Iowa 2016) ("It is well-settled law that the act of avoiding law enforcement after a crime has been committed may constitute circumstantial evidence of consciousness of guilt that is probative of guilt itself.").

Under the facts here, the district court did not abuse its discretion in denying Gonzalez's motion for mistrial. We affirm his conviction for first-degree murder.

**AFFIRMED.**