# IN THE COURT OF APPEALS OF IOWA

No. 22-0472
Filed January 10, 2024

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**WILLIAM RUSSELL GRIFFIN,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Greene County, Thomas J. Bice (trial) and Christopher C. Polking (posttrial motions), Judges.

William Griffin appeals his convictions for two counts of stalking. **AFFIRMED.**

Jesse A. Macro Jr. of Macro & Kozlowski, LLP, West Des Moines, for appellant.

Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney General, for appellee.

Considered by Bower, C.J., Chicchelly, J., and Gamble, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**GAMBLE, Senior Judge.**

On appeal, William Griffin challenges the sufficiency of the evidence to support his convictions on two counts of stalking. Griffin also contends the court erred in failing to make the proper inquiry of defense counsel and himself when defense counsel moved to withdraw and declare a mistrial. Griffin maintains the court erred in denying his motion for new trial based on him not being present at a deposition. Finally, Griffin claims the trial court erred in admitting hearsay statements in a police report. We affirm.

**I. Background Facts.**

After several months of contention between Griffin and Dalton Defenbaugh and Dalton's mother, Jodi Defenbaugh,[1] Griffin was charged with first-degree criminal mischief, stalking Dalton, stalking Jodi, and trespass resulting in damage in excess of $300.

The case proceeded to a jury trial. After three days of trial, which included some of the defense witnesses and the State proposing a new plea offer, defense counsel asked that the following record be made:

> The first thing, is my client is upset that Vicki Mitchell was deposed without his presence. Vicki Mitchell was deposed after we had a deposition where my client, we had to cancel the deposition because my client ended up yelling and cussing at the prosecutor so we stopped the deposition. He waived his presence at a subsequent deposition and then Vicki Mitchell's deposition. I spoke with him and he told me that he was fine not having Vicki Mitchell there. I sent him a waiver. My understanding was that he had a waiver signed and my client was upset. [client interjecting] My client was upset about the substance of Vicki Mitchell's deposition, indicating he didn't think she would have said what she said if he was there. [client interjecting]

---

[1] Because Dalton and Jodi share a surname, we will refer to them by their first names.

. . . Your Honor, we are at a position now where we have—this is an ongoing kind of conflict and, quite frankly, I'm inclined at this point to ask for a mistrial to allow this whole case—Ms. Mitchell perhaps to be re-deposed with my client present, ask to withdraw. There's been an—essentially, there's been an extreme breakdown between me and my client. Our relationship is irretrievably broken at this place.

The court asked that counsel first address "the original purpose of this record and that is the plea offer that was made and whether or not your client accepts or rejects either one of the offers that were tendered."

[DEFENSE COUNSEL]: Okay. Mr. Griffin, did you have an opportunity to speak with me about the offer from [the prosecutor]?

MR. GRIFFIN: Yeah, I wanted to be present for these offers and that way I could maybe possibly negotiate a better plea for myself.

THE COURT: You were present, sir, when the offers were made just here this morning. You were present.

MR. GRIFFIN: I meant, wanted to be able to talk with you about possibly getting a different resolution for this. I'm not against resolving all these matters but I want it done in a manner that I'm not having to plead guilty to felonies and bunch of costs and jail time and there's other ways this could get worked out, I think that would be adequate for everybody. I'm trying to get my life together here.

THE COURT: Long story short, are you rejecting on a voluntary, knowing, informed basis, the offers that have been presented? Is that true?

MR. GRIFFIN: Yes.

Turning to the motion for mistrial, the prosecutor noted the case was more than a year old, Griffin had already had other attorneys withdraw, and the jury trial was "probably ninety percent" done. He argued there was no good cause for a mistrial and to grant one would be a waste of judicial and public resources.

Defense counsel again noted his relationship with Griffin was "irretrievably broken" and stated, "If the court forces me to go forward at this point, I'm afraid I'll be ineffective. I don't take these things lightly."

The court acknowledged defense counsel's unenviable position but found "what we have here is manipulation." The court continued:

> I believe the defendant is, if you will, trying to drive the bus and that's not the way our system works. You know, when things aren't going his way, all of the sudden we have a motion for mistrial after three full days of testimony. We are on the closing portions of this trial and I agree with the State that to pull the plug on this trial at this point would be unfair to the State. It would be unfair to the system. It would be somewhat offensive to this court and the court is convinced that we need to proceed. If there are witnesses that need to be deposed, I'll give you whatever recesses are appropriate to take those depositions before people are allowed to testify. The court does note that this case has been on file now for over a year. The court also notes, consistent with the comments made, that there have been numerous lawyers that have been appointed and then withdrawn and, frankly, the court believes that this defendant is a difficult person to work with just because of his attitude and his attempt to manipulate what's going on, his counsel, the court, and the system. And, frankly, this court will not permit it. So your motion in that regard is overruled and we'll proceed with the final witnesses, any rebuttal testimony there might be, arguments and we are going to get this case submitted.

The defense resumed presenting its witnesses, and the case was submitted to the jury.

The jury acquitted Griffin on the criminal-mischief and trespass counts and found him guilty of each count of stalking. Defense counsel was allowed to withdraw, new counsel was appointed to represent Griffin, and additional time was granted to allow transcripts to be prepared and new counsel to file posttrial motions. The posttrial motions were prepared, resisted by the State, and orally argued. The district court prepared a lengthy written ruling denying the motions for new trial. Griffin appeals.

**II. Discussion.**

Griffin first contends there is insufficient evidence to sustain the stalking convictions.

*Sufficiency of the evidence.* "In evaluating sufficiency-of-evidence claims, we will uphold a verdict if substantial evidence supports it. Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *State v. Wilson*, 941 N.W.2d 579, 584 (Iowa 2020) (cleaned up) (quoting *State v. Trane*, 934 N.W.2d 447, 455 (Iowa 2019)). In reviewing sufficiency-of-the-evidence claims, it is not the appellate court's place "to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury." *State v. Brimmer*, 983 N.W.2d 247, 256 (Iowa 2022) (citation omitted).

In its ruling on posttrial motions, the trial court provided an extensive summary of the evidence presented at trial.[2] Viewing the evidence in the light most favorable to upholding the verdict, a reasonable jury could find these facts, as noted by the trial court:

> [Griffin] was agitated and upset when Deputy [Cole] Crowder spoke to him on June 27, 2020, regarding complaints from [Dalton] about [Griffin]'s dog and his son . . . driving around town on a chopper bike. Griffin felt that [Dalton] was attacking him and his son for petty things. [Griffin]'s demeanor was described as "very upset," "furious," "disgusted," and his voice was raised. The deputy advised Griffin to ignore Dalton and not let him get a rise out of him and "[Griffin] did not seem happy with the advice I had given him."

---

[2] Due to posttrial substitution of counsel, trial transcripts were available to the district court and the parties before posttrial motions were addressed. The judge who ruled on the posttrial motions was not the trial judge, and it is evident by the court's summation of the evidence that the transcripts were thoroughly reviewed.

[Dalton] testified that he lived next door to [Griffin] in Rippey, Iowa. His mom is [Jodi] and she also lived in Rippey. He moved into his house in December of 2018 after doing substantial renovations since its purchase in June of 2018. Even during renovations, problems arose with [Griffin] trespassing across his property, letting his dog run loose and go to the bathroom on his property, leaving trash on Dalton's property weekly (including nails and broken glass). When asked to address these situations, [Griffin] would respond with "go fuck yourself," "I don't abide by your rules," "my dog is not your deal," "he can do pretty much anything he wants," "his dog can go anywhere it wants," "I don't really care anything you have to say," "nobody's going to change anything."

Dalton then put up a privacy fence. This led to a property line dispute and issues regarding moving rocks and a lilac bush that were allegedly on Dalton's property. These led to further discussions and anger from [Griffin], "I just constantly get, go fuck yourself. I'm not going to do what you say. I can do whatever I want."

[Griffin] had a scowling bad attitude. [Griffin] would park his vehicles in front of Dalton's mail box and this would prevent his mail from being delivered.

In February of 2020 Dalton witnessed [Griffin] threaten his mother Jodi. [Griffin] told her in a threatening manner to keep his name out of her mouth, or he would keep it out for her. This was due to a Facebook post where Jodi thought a dog posted as running loose was Griffin's. He continued yelling back and forth at Jodi, very angry. After numerous times telling him to leave, Griffin finally did.

After this incident, [Griffin] would start to drive very slowly if he saw Dalton. Dalton felt this was to try and scare and intimidate him. Sometimes Griffin would yell at him from his car. Dalton made regular reports to the police about loose dogs and being yelled at, and Griffin told him to keep snitching and he would see what happens. Dalton believes he made police reports about Griffin at least four or five times in 2020.

When out in his yard, [Griffin] would scowl and say things like, what the fuck are you looking at, and if you don't give me some respect I'm going to teach you some, I'll catch you somewhere. Dalton believes this happened at least [twenty-five] times. He found it to be very intimidating.

Around the end of April 2020 Dalton noticed that his dog was getting sick, and throwing up. There was a dead patch of grass near the privacy fence. Griffin was asked what he had put on the grass in case the dog might need veterinary treatment. Griffin told Dalton to go fuck himself and he would not say what was on the grass. Jodi was present and also asked Griffin what he put on the grass. Griffin then stated that he was going to beat Dalton in the head until he was . . . like his sister[, a person with disabilities]. This scared Dalton.

On May 3, 2020 Dalton returned home from a weekend camping trip to find several windows broken out of his home, a running garden hose stuck into the basement, and tools and money stolen from his house. There was eight inches of water in the basement and a wall became warped because of it. Dalton bought three motion activated security cameras due to this incident. The cameras became another source of conflict and contention with Griffin.

When asked if he knew anything about the damage, Griffin stated that someone must have taught him a lesson or taught him some respect, that someone had made him pay. Jodi was present.

Overall Dalton estimated that between April 2019 and June 28, 2020, that Griffin had cussed at him between [fifty] and 100 times. He estimated that Griffin had threatened him during this time period around [twenty-five] times. He testified that he tried to ignore it at first, but began to feel terrorized.

Dalton awoke on June 28, 2020, to his mom screaming. She had seen activity on the cameras and came to Dalton's house to find it vandalized with red paint. His truck window was also broken. There was also some paint on the truck. Counts I and IV were related to this incident. Mr. Griffin was found not guilty of those counts, so the court does not believe that the evidence related to the criminal mischief itself can be seen to support his convictions for stalking (although his behavior afterward would be relevant to the stalking counts). The jury clearly did not find any criminal mischief or trespass related to the June 28 incident to have been proven beyond a reasonable doubt as involving Griffin as the perpetrator.

Dalton testified that he is in the process of finding a new home as he is tired of being scared to live in his own home.

[Jodi] testified that Griffin is her cousin, on her mom's side. Her mother is Vicki Mitchell.

She had a conversation with Griffin that Dalton was going to put up a privacy fence. She said he got upset and said they had the property line wrong. When asked about the need to move some rocks and a lilac bush she noted that the rocks did get moved and says Griffin told her to go ahead and trim the bush. . . . However, when she told Griffin more rocks needed move, he became very angry and said he wasn't doing anything.

Jodi corroborated that she would often see trash in Dalton's yard near Griffin's property line, including glass, nails, and beer bottles. She said this occurred "all the time."

Jodi testified that [Griffin]'s behavior abruptly became more aggressive and scary around the end of February 2020. This was when she commented on the Facebook post saying a loose dog might be Griffin's. She said he pulled up to her driveway and started screaming at her to keep his name out of her mouth, and that if she didn't, he was going to do it for her. She took this to mean he would

hurt her. She described him as extremely angry at the time and screaming.

After this, she said [Griffin] would drive past her house glaring at her and point his hands like he was shooting at her. This testimony caused her to become so distraught on the stand that she needed a break.

She testified that Griffin would tell her to fuck off, that he doesn't play by the cops' rules, that he does whatever he wants to do, that they would get what pigs get.

She corroborated the damage found to Dalton's house on May 3, 2020. A few days later she and Dalton were outside when [Griffin] came out. He asked her what the fuck she was looking at. She testified that [Griffin] stated that someone must have taught Dalton a lesson. She accused Griffin of doing it and he said that he had told her that he would get her.

Jodi recalled another incident in May of 2020 when she was walking with her daughter and their dogs when [Griffin] pulled up in his vehicle and began revving his engine. She stated that she and her daughter were both scared and upset by this.

Jodi recalled the incident when Dalton's dog got sick. Dalton was looking over the fence at the patch of dead grass in Griffin's yard when he came out and asked what the fuck he was looking at. Dalton asked him what was sprayed and Griffin told him to fuck off and that he doesn't have to do anything he says, or listen to him. Jodi then asked him to please tell as the dog was sick, and he told her to fuck off and that she needed to do something about her son or he was going to beat his head in so that she had two . . . kids to take care of instead of one.

After finding the damage on June 28, 2020, at some point [Griffin's son] came out with their dog. She yelled at him to get his dog. Griffin then came out a short time later screaming to not threaten his son. Vicki Mitchell was also there. Griffin told Vicki to do something about Jodi and Dalton, because Vicki knew what Griffin was capable of.

Jodi told Griffin he needed to fix the damage and he sent a kid over to help clean up.

Jodi has found a place to live outside of Rippey as she does not feel safe, she is afraid of Griffin, scared for herself, scared for her son, afraid to go out by herself for walks or runs, scared to be at her house by herself.

Deputy Shane Allen executed a search warrant on June 28, 2020, on Griffin's residence looking for evidence related to the criminal mischief. [Griffin] made statements that he was getting tired of people putting him and his son in a place of danger. [Griffin] acknowledged struggling . . . . [Griffin] made statements that he just wanted left alone and he believed the Defenbaughs were harassing him. He was upset they had brought his son into it. He questioned

whether he was just supposed to take that behavior. He described Dalton as the idiot next door and was upset he had called the police on his dog and on his son.

Vicki Mitchell testified that it made her nervous to be around Griffin, because he made and carried out a lot of threats. She described hi[m] as having a temper. She was the executor of her brother's estate, Michael Pittman, who had left his house to Griffin. Griffin moved back to Rippey from Florida to move into the house after Michael died. She stated that she got along pretty well with Griffin at that time.

Vicki testified that she one time heard Dalton discuss the issue of Griffin's dog running loose with Griffin. She says that Griffin responded with fuck you, I don't have to. She also discussed the incident on June 28, 2020, when Jodi told [Griffin's son] to keep his dog out of the yard. She said that [Griffin] came out angry accusing them of threatening his son. Griffin offered [his son]'s friend $100 to go over and help them clean up the damage.

Vicki tried to have a conversation with Griffin about the damage. She asked him to just stop all the conflict, leave it alone and drop it. He responded: You know me. I can't. I'm not made that way. I can't just drop something. I'm going to get it finished. I'm going to finish it. Somebody's going to get hurt. It ain't gonna be me.

She told him he better not hurt her daughter or grandson and he said well, somebody's going to get hurt.

She asked him if he had honestly threatened to beat Dalton's head in and make him . . . like his sister and he said he may have, yeah, I guess I did. She asked him how he would feel if someone made a threat like that to [his son] and Griffin said he would kill them. She asked him what have they done to you, and he said I don't know, I'm just going to finish it, if they'd just shut their goddamn mouth.

The court also noted the evidence at trial showed Dalton could respond

angrily to Griffin, and others, and would yell and cuss. The court wrote:

The gist of the defense appeared to be two parts. One, denying that explicit threats were made, and two, pointing to the bad behavior of the Defenbaughs as far as arguing and cursing. There are two problems for the defendant in this evidence. First, even if the Defenbaughs also acted badly, that provides no legal justification for the defendant's actions. There is no justification defense to stalking. Put in the old adage, two wrongs don't make a right. If [Griffin] believed the Defenbaughs were acting wrongly, his remedies were to contact the authorities, and/or pursue civil legal remedies. Secondly, by trying to portray the Defenbaughs as bad actors, the defendant also ends up showing that he had anger, and strong

negative feelings against them that can be seen as his motive in engaging in his stalking behaviors. . . .

[Griffin] himself acknowledged that he was angry at the Defenbaughs for several reasons including the dispute over his father's estate, the property line dispute, the dog issues, the security cameras, the Facebook post, his girlfriend moving out of his house, and what he saw as threats towards his son. He says he felt "baited" by them into acting badly. He admitted he felt he needed to confront them over the Facebook post. He acknowledged that in the heat of the moment he runs his mouth without thinking. He admitted making threats, but stated that he did not believe they were made in such a manner that would cause a reasonable person to feel threatened, but then acknowledged that what he said could be interpreted differently than he intended. He stated more than once that he felt he needed to "one up" the statements he was getting from the Defenbaughs, and that he told Dalton that someone needed to teach him some respect.

The jury was instructed that to find Griffin guilty of stalking Dalton, the State had to prove: (1) During the timeframe of April 2019 through and including June 2020, the Griffin "purposefully engaged in a course of conduct directed at [Dalton] that would cause a reasonable person either to feel terrorized, frightened, intimidated, or threatened, or to fear that [Griffin] intended to cause bodily injury to, or the death of, [Dalton] or a member of [Dalton]'s immediate family" and (2) Griffin "knew or should have known that his course of conduct would cause a reasonable person either to feel terrorized, frightened, intimidated, or threatened, or to fear that [Griffin] intended to cause bodily injury to, or the death of, [Dalton] or a member of [Dalton's] immediate family." The jury received an identical instruction regarding the count alleging Griffin stalking Jodi, but her name was substituted for Dalton's.

A "course of conduct" was defined in the instructions as meaning:

(a) repeatedly maintaining a visual or physical proximity to a person without legitimate purpose;
(b) repeatedly utilizing a technological device to locate, listen to, or watch a person without legitimate purpose; or

> (c) repeatedly conveying oral or written threats, threats implied by conduct, or a combination thereof, directed at or toward a person.

"Repeatedly" was defined as "on two or more occasions."

Despite Griffin's protestations about Dalton's conduct, we concur with the district court's observation that two wrongs don't make a right. The evidence outlined above is more than sufficient to support a reasonable jury finding that Griffin "on two or more occasions" "convey[ed] oral . . . threats, threats implied by conduct, or a combination thereof, directed at or toward" both Dalton and Jodi. Dalton testified Griffin threatened him more than twenty times and Griffin himself admitted making threats to Dalton several times. Jodi testified Griffin threatened her and Dalton more than three times.

Griffin denied his threats could reasonably induce terror, fear, or intimidation but we conclude substantial evidence was presented from which a jury could find—at the very least—Griffin should have known Dalton and Jodi would reasonably feel terrorized, frightened, intimidated, or threatened, or fear that Griffin intended to cause bodily injury to each of them or their family members. Griffin himself told Vicki Mitchell he "may have" threatened to beat Dalton so badly that his mother would need to care for him. Substantial evidence supports the convictions.

*Substitution of counsel.* "Our review of a district court's denial of a request for substitute counsel is for abuse of discretion. To establish an abuse of discretion, [the defendant] must show that 'the court exercised the discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *State v. Lopez*, 633 N.W.2d 774, 778 (Iowa 2001) (internal citation omitted).

While a criminal defendant has a right to counsel under the Sixth Amendment, the defendant is not guaranteed a "meaningful relationship between [the] accused and [their] counsel." *Id.* (citation omitted). "To justify the appointment of substitute counsel, a defendant must show sufficient cause" such as "a conflict of interest, irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant." *Id.* at 778–79 (citation omitted). And unless the defendant "has been denied counsel or counsel has a conflict of interest," the defendant must show prejudice. *Id.* at 779 (citation omitted).

In considering a request for substituted counsel, the trial court must balance "the defendant's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice." *Id.* (citation omitted). The district court "should not allow 'last-minute requests to substitute counsel . . . to become a tactic for delay.'" *Id.* (alteration in original) (citation omitted); *see also State v. Tejeda*, 677 N.W.2d 744, 750 (Iowa 2004) ("Last-minute requests for substitute counsel, insofar as they constitute a delay tactic, are disfavored.").

Here, counsel's motion for mistrial and substitution of counsel came after three days of a jury trial—after the State had presented its case-in-chief and the defense had called witnesses. And the court made a specific finding Griffin was attempting to manipulate the process. On our review, we conclude the district court appropriately balanced the necessary considerations.

But Griffin asserts the court failed to make the proper inquiry about the breakdown of the attorney-client relationship when defense counsel moved for mistrial. *See Tejeda*, 677 N.W.2d at 750 (explicitly recognizing "there is a duty of

inquiry once a defendant requests substitute counsel on account of an alleged breakdown in communication"). We begin with the observation that Griffin did not request substitute counsel; defense counsel did. Moreover, defense counsel explained why Griffin was unhappy about his absence from Vicki Mitchell's deposition and the pretrial questioning of another defense witness; Griffin interrupted and claimed not to have waived his presence at depositions and informed the court he had wanted to try to negotiate a better plea deal than the one offered during trial. So, the trial court was made aware of the nature of the communication difficulties between Griffin and defense counsel. *Cf. id.* at 751 (noting "there is nothing suggesting the court determined the nature of the alleged breakdown in communication").

In any event, Griffin does not argue, much less show, he was prejudiced by the denial of defense counsel's motion to substitute counsel. He would be hard-pressed to show prejudice since he was acquitted of two of the four counts; Griffin was acquitted of first-degree criminal mischief, which was the only felony count. He was convicted of two aggravated misdemeanors. We cannot say there was an abuse of the court's considerable discretion in denying the motion for mistrial and substitution of counsel.

*Absence from Vicki Mitchell deposition.* At the time of this trial, Iowa Rule of Criminal Procedure 2.27 provided:[3]

---

[3] Iowa Rule of Criminal Procedure 2.27 now also allows the defendant's absence, "With the consent of the prosecuting attorney, the defendant may waive presence at a deposition. The defendant's attorney shall make a record of the waiver at the deposition. Otherwise, the defendant is required to be present subject to rule 2.13(5) and rule 2.13(6)(c)." Iowa R. Crim. P. 2.27(1)(c).

(1) *Felony or misdemeanor.* In felony cases the defendant shall be present personally or by interactive audiovisual closed circuit system at the initial appearance, arraignment and plea, unless a written arraignment form as provided in rule 2.8(1) is filed, and pretrial proceedings, and shall be personally present at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule. In other cases the defendant may appear by counsel.

(2) *Continued presence not required.* In all cases, the progress of the trial or any other proceeding shall not be prevented whenever a defendant, initially present:

a. Is voluntarily absent after the trial or other proceeding has commenced.

b. Engages in conduct justifying exclusion from the courtroom.

"We review the district court's interpretation of our criminal rules of procedure for correction of errors at law."[4] *State v. Folkerts*, 703 N.W.2d 761, 763 (Iowa 2005).

Griffin asserts the court erred in not granting a new trial because he was not present at the deposition of Vicki Mitchell, contending he did not have the ability to waive his presence at a deposition. In *Folkerts*, our supreme court observed, "We have previously held a defendant cannot waive his or her right of confrontation in order to be absent from a discovery deposition of an eyewitness to a crime." *Id.* But the court disavowed its prior rulings concluding, "To avoid the likelihood that a tainted identification may take place during the part of the deposition when the parties question an eyewitness regarding the identity of the perpetrator of the crime, the district court should allow a defendant to be absent from that part of the deposition." *Id.* at 766; *see also Van Hoff v. State*, 447 N.W.2d 665, 674 (Iowa Ct. App. 1989) (noting "a discovery deposition not taken for use at trial is not a 'stage

---

[4] Griffin contends our review should be de novo because he raises a constitutional issue.

of trial'" and a defendant's presence is therefore not required under the rules of criminal procedure); *Beloved v. State*, No. 17-1908, 2019 WL 1300224, at *4 (Iowa Ct. App. Mar. 20, 2019) (concluding Beloved's waiver of presence at a deposition, "to any extent it was necessary, was knowing, intelligent, and voluntary").

Generally, a defendant is allowed to waive his constitutional rights so long as the waiver is "voluntary, knowing, and intelligent." *See State v. Hinners*, 471 N.W.2d 841, 845 (Iowa 1991). Griffin did so here. Griffin electronically signed the written waiver.[5] On appeal, Griffin does not claim his waiver was uninformed or involuntary. We find no error.

*Hearsay.* Finally, Griffin contends the district court erred in admitting hearsay, that is, the police report prepared by Deputy Crowder. The State concedes the document itself does contain hearsay statements and should not have been admitted but asserts Griffin suffered no prejudice.

"[T]he district court lacks 'discretion to admit hearsay in the absence of a provision providing for it' or deny the admission of hearsay if it falls within an exception." *State v. Thompson*, 982 N.W.2d 116, 121 (Iowa 2022) (citation omitted). Consequently, we review hearsay issues for correction of errors at law. *Id.* "We consider inadmissible hearsay to be prejudicial to the nonoffering party 'unless the record affirmatively establishes otherwise.'" *Id.* (citation omitted); *see* Iowa R. of Evid. 5.103(a) ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party . . . .").

> To determine whether the error is harmless we ask: Does it sufficiently appear that the rights of the complaining party have been

---

[5] An earlier deposition of Vicki Mitchell was stopped because Griffin yelled and swore at the prosecutor.

injuriously affected by the error or that he has suffered a miscarriage of justice? We presume prejudice—that is, a substantial right of the defendant is affected—and *reverse* unless the record affirmatively establishes otherwise.

In considering whether the admission of hearsay is reversible error, we have held that notwithstanding the presumption of prejudice from the admission of such evidence, the erroneously admitted hearsay will not be considered prejudicial if substantially the same evidence is properly in the record.

*State v. Newell*, 710 N.W.2d 6, 19 (Iowa 2006) (cleaned up).

The State asserts the record affirmatively establishes Griffin was not prejudiced by the hearsay statements in the police report. The deputy first testified to the substance of police report. Without objection, the deputy explained that when he told Griffin about Dalton's complaint, Griffin "was agitated, he was upset. He felt that Mr. Defenbaugh was attacking him and his son for petty things." The deputy described Griffin as "furious . . . during our conversation." The deputy also testified, without objection, that he talked to Griffin's son about the complaint. The defense objected to admission of the police report because "they're hearsay. The witness'[s] testimony is sufficient." Dalton testified about the substance of the complaint he made to the deputy that resulted in the contact the deputy reported. Griffin also testified about the conversation he had with the deputy. Because "substantially the same evidence is properly in the record," the admission of the report is harmless error. *See id.*

Having found Griffin's challenges to his convictions either without merit or harmless, we affirm.

**AFFIRMED.**